**Lonnie K. STEPHENS, Petitioner,**

v.

**Leta MORRIS, Probation Officer; and Attorney General, State of Indiana, Respondents.**

**Civ. No. F 90–68.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Feb. 8, 1991.

Robert G. Forbes, Forcum & Forbes, Hartford City, Ind., for petitioner.

Donald J. Semler, Deputy Atty. Gen., Indianapolis, Ind., for respondents.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Petitioner was sentenced to twenty (20) years for an attempted rape, a class B felony, which he was convicted on October 27, 1987. The conviction was affirmed by the Indiana Supreme Court. *Stephens v. State,* 544 N.E.2d 137 (Ind.1989). Having exhausted his state remedies, petitioner turned to this federal court for relief.

Stephens challenges his conviction on the following grounds:

(1) The Indiana Rape Shield Statute should not be construed as to preclude testimony concerning statements and acts of the principals at the time and place of the alleged offense.

(2) A statutory rule of evidence such as the Rape Shield Statute cannot "take precedence" over due process of law.

For the following reasons, the petitioner's application for writ of habeas corpus will be DENIED.

*Facts*

On the evening of March 17, 1987, the petitioner, Lonnie Stephens ("Stephens") went to the house trailer of the prosecutrix. Also at the trailer that evening were the prosecutrix's son, age four; her sister and brother-in-law, and their son, age three months. The entire time Stephens was there, both the sister and the brother-in-law and the two children remained asleep. Both the prosecutrix and the defendant tell vastly different versions of what took place that evening. There was no physical evidence nor were there witnesses. Petitioner asserts that the crucial factor in his appeal is that he was prevented from relating his entire version of the events of the evening.

*Testimony of Prosecutrix*

The prosecutrix asserted that Stephens came into her home through an unlocked front door while she was asleep on the couch. She sat upright on the couch and Stephens sat down next to her and put his arms around her. She moved down the couch and Stephens followed her and again put his arm around her. This action was repeated a second time, after which the prosecutrix yelled for her sister. After Stephens removed his arm, the prosecutrix asked the petitioner to leave. Stephens put his arm around her again and this time he attempted to kiss her. The prosecutrix yelled for her sister, this time at the top of her lungs. Stephens retreated momentarily, then tried to put his arms around her. The prosecutrix was able to knock him to the floor, causing him to collide with the coffee table. The prosecutrix yelled for her sister a third time, and again, no one responded. Stephens got to his knees and attempted to kiss the victim's feet. At some point during these activities, Stephens unfastened the prosecutrix's bra and ripped her shirt.

Stephens finally agreed to leave but asked if he could use the bathroom first. When he returned he asked the prosecutrix whose little boy was in the bedroom. The prosecutrix replied he was her sister's. Stephens became upset and threw the prosecutrix on the couch because he felt she had lied about who was in the trailer. He put one hand over her mouth and put his other hand on her jeans between her legs. Stephens began to unfasten her pants but the prosecutrix was able to shift her body weight which caused the petitioner to lose his balance and fall to the floor. The prosecutrix then got up from the couch and ran to the bedroom where her sister and brother-in-law were asleep.

After waking her sister and brother-in-law, the prosecutrix testified that her brother-in-law got up and looked out the window by the front door. He testified that he saw a man in a red shirt running in a southeasterly direction. Visibly upset, the prosecutrix told her sister what had just transpired. The prosecutrix asked her sister if she could see any marks on her face. Her sister testified that there were marks on the prosecutrix's entire face. Her sister further testified that it appeared as if someone had put their hand over her mouth, the impressions from their fingers were still visible on her cheek.

Around 11:30 P.M., the prosecutrix received a telephone call from her estranged husband. He had previously arranged to be at the trailer at 10:00 that evening to visit their son. The prosecutrix told her husband that Stephens tried to rape her. Her husband finally arrived between 1:00 A.M. and 1:30 A.M., after he had first stopped by the Stephens' residence.

When her husband arrived, he was in an agitated state and made enough noise to wake the prosecutrix's sister and brother-in-law. Her brother-in-law and husband became involved in a verbal and physical altercation which caused the prosecutrix's sister to call the police. By the time the police arrived the situation between the two men had calmed down. While the police were present, neither the prosecutrix or any other person told the police about the alleged attempted rape by Stephens. In fact, there was no report made to any law enforcement agency about Stephens until after the prosecutrix was confronted by her landlady.

The following evening the prosecutrix was in an automobile with her brother-in-law when she was stopped by the landlady,

Pat Bosworth, who complained about the police being called for the disturbance in her trailer. The landlady told the prosecutrix that she would not have any problems in her trailer park. Even though the landlady was talking about the police being called in response to the fight between her husband and brother-in-law, the prosecutrix indicated to the landlady that the police were called because Stephens was an intruder in her trailer. The landlady suggested that the prosecutrix go to the police to get a restraining order. The prosecutrix and her brother-in-law went to the Blackford County Jail where the prosecutrix stated that she needed to report an attempted rape. She was referred to the Hartford City Police Department, where she made the report.

### Testimony of Lonnie Stephens

After almost a full day of drinking beer with David Stone, Stephens asked Stone to drop him off at the prosecutrix's. Since he was drunk and already late in getting home, Stephens decided instead of going home and having his girlfriend get mad at him, he would take the prosecutrix up on her open invitation for him to visit sometime. Stephens maintained that when he arrived at the trailer at about 10:00 P.M., the prosecutrix was awake and after a brief conversation she invited him in. Stephens motioned to Stone that it was alright to leave without him. Initially, on direct examination by the State, Stone gave a completely different version of the events. Stone testified that he dropped Stephens off at a liquor store near the trailer park, however, on cross-examination Stone acknowledged that he had dropped petitioner off at the prosecutrix's and had perjured himself on behalf of the petitioner.

At the prosecutrix's suggestion, Stephens carried her sleeping child from the living room couch into her bedroom. Stephens returned to the living room and joined the prosecutrix on the couch. After a few minutes of small talk about her pending divorce, Stephens asked the prosecutrix if he could give her a kiss. While kissing, Stephens began to play with the prosecutrix's breast and eventually unfastened her bra. Since they could not lie down comfortably on the couch, the prosecutrix suggested they lay down on the floor. Both the prosecutrix and Stephens helped move the coffee table and pushed it against a chair opposite the couch. Stephens started undressing and also helped undress the prosecutrix; first her shirt and then removing her bra the rest of the way off. After removing their pants the parties engaged in sexual intercourse. Stephens stated that while they were having intercourse he told her that Tim and Drema Hall told him that they had participated in sexual partner switching in which she was involved and that she had the reputation of liking sexual intercourse "doggy fashion." Stephens testified that the prosecutrix became so angry she made him stop and told him to leave. Stephens immediately got dressed and as he was leaving he heard the prosecutrix call for her sister.

Once outside Stephens said he went in a southeasterly direction, first walking rather quickly, then running. It was about thirty (30) degrees outside and his coat was in the back seat of Stone's car. Not sure where he was going, Stephens then remember that Stone's nephew, Michael lived nearby. Continuing in the direction toward Michael Stone's house, Stephens testified that he recognized the house of Jeff and Lisa Strait and stopped there instead of Michael Stone's. Jeff Strait was the nephew of another of Stephens' best friends, Bruce Strait and not someone Stephens generally ran around with. Nevertheless, it was freezing out and he needed to get out of the cold. Stephen arrived at the Strait's home around 10:15 P.M., where he found Jeff Strait and Steve Barnes watching a home video of a motorcycle race. Stephens told Strait that he and David Stone had been riding around and that Stone had left him at Hughes Pic a Pac. Stephens testified that he lied to Strait and Barnes because he did not want them to know he had been at the prosecutrix's trailer and had had sex with her and to explain why he did not have a coat on. Stephens stayed and finished watching the video with Strait and Barnes and at about 11:10, Barnes took the petitioner home.

Between 12:30 A.M. and 1:00 A.M., the prosecutrix's husband appeared at the Stephens' trailer demanding to speak to Stephens. The husband asked Stephens what was he doing "trying to screw his old lady." Stephens denied the charge and after an exchange of words, the husband left the trailer.

Stephens admitted telling his girlfriend four different versions of what happened that evening. In the first version, the night the prosecutrix's husband confronted Stephens at his home, he denied that he ever saw the prosecutrix that evening. Stone and he were separated at the liquor store and he walked over to the Strait's to get a ride home. The next account was told the night he was arrested. He admitted he saw the prosecutrix, but only spoke to her on her porch; he never went inside the trailer. This was also the version he gave to Officer Allen Bell in the official police report of the incident. The third version was told after he was released from jail. He still denied that he went inside the trailer, but admitted that Stone dropped him off the prosecutrix's trailer instead of the liquor store. The final version came after Stone perjured himself and his girlfriend had been deposed. Stephens admitted that he was inside the trailer and in fact had sex with the prosecutrix. Stephens maintained that he lied because he was afraid his girlfriend would leave him and take the children.

### Background

Petitioner's principal argument poses a constitutional challenge to the state court's application of Indiana's Rape Shield Statute, I.C. 35–37–4–4.[1] Stephens claims that the trial court violated his constitutional right to testify and to present a defense under the fifth, sixth and fourteenth amendments to the U.S. Constitution. Stephens would have testified that Tim and Drema Hall told him that they participated in sexual partner switching in which the victim was involved and that she had the reputation of liking sexual intercourse "doggy fashion." The trial court rendered the offered testimony inadmissible. Stephens asserted that the testimony excluded was evidence concerning the *res gestae* of the offense and not reputation evidence addressed by the statute. In addition to showing that the prosecutrix was enraged by the statements, the testimony was to establish that the alleged victim reported the attempted rape in order to provide a justification to her landlady for the police having been called to her trailer in the middle of the night. However, the trial court held that the proffered evidence was evidence of prior sexual conduct of the prosecutrix and was barred by the Indiana's Rape Shield Statute. The petitioner was allowed to testify that while engaging in sexual intercourse he said something to the prosecutrix which caused her to be angry. Stephens argued, however, that that was not his primary purpose in offering the testimony. Since the proffered evidence was not admitted by the trial court, the petitioner alleges that he was precluded from presenting his argu-

1. The statute in question reads in relevant part, as follows:

(a) In a prosecution for a sex crime as defined in I.C. 35–42–4:
(1) Evidence of the victim's past sexual conduct;
(2) Evidence of the past sexual conduct of a witness other than the accused;
(3) Opinion evidence of the victim's past sexual conduct;
(4) Opinion evidence of the past sexual conduct of a witness other than the accused;
(5) Reputation evidence of the victim's past sexual conduct; and
(6) Reputation evidence of the past sexual conduct of a witness other than the accused;

may not be admitted, nor may reference be made to this evidence in the presence of the jury, except as provided in this chapter.
(b) Notwithstanding subsection (a) evidence:
(1) Of the victim's or a witness' past sexual conduct with the defendant;
(2) Which in a specific instance of sexual activity shows that some person other than the defendant committed the act upon which the prosecution is founded; or
(3) That the victim's pregnancy at the time of the trial was not caused by the defendant;
may be introduced if the judge finds, under the procedure provided in subsection (c) of this section, that it is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

ment to the jury with regard to how the evidence was important.

The state contends that allowing a proposed exception to the Rape Shield statute that would permit *res gestae* statements would make the statute a nullity and undercut its very purpose. It is the state's position that had the petitioner been permitted to testify as to his alleged statement, the State would have been placed in a position of collaterally proving there was no basis for the alleged statement, or not presenting any evidence to contradict the statement and risking the resulting prejudice. The right to present relevant testimony is not without limitation. The right "may in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973). In the state's view, the procedural limitations placed on the petitioner's right to present the proffered testimony were neither arbitrary nor disproportionate to the purposes they were designed to serve. The petitioner in this case was permitted to put forward his theory of the defense. He was permitted to testify that the encounter involved a consensual act of sex, that he said something to the victim that made her angry and subsequently made her pursue the attempted rape charge.

## Analysis

■ Every state is generally free to exercise its sovereign prerogative as to the evidence it will admit in its courts. *McMorris v. Israel,* 643 F.2d 458, 460 (7th Cir. 1981), *cert. denied,* 455 U.S. 967, 102 S.Ct. 1479, 71 L.Ed.2d 684 (1982). The federal constitution, however, imposes a limited restraint upon state evidentiary rules where exculpatory evidence is excluded by arbitrary state rules. *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The genesis of this restriction is found in the petitioner's Sixth Amendment right to "compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. The Constitution imposes this limitation because the state may not deny an accused in a criminal trial the right to a fair opportunity to defend against the state's accusations. *Chambers,* 410 U.S. at 294, 93 S.Ct. at 1045. However, the right of a petitioner to present relevant and competent evidence is not absolute and may bow to accommodate other legitimate interests in the criminal trial process, *Hughes v. Mathews,* 576 F.2d 1250, 1258 (7th Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978) (citing *Chambers,* 410 U.S. at 295, 93 S.Ct. at 1045), although the competing state interests must be substantial to overcome the claims of the petitioner. See *United States v. Nixon,* 418 U.S. 683, 712–13, 94 S.Ct. 3090, 3109–10, 41 L.Ed.2d 1039 (1974). Most importantly, "where constitutional rights affecting the ascertainment of guilt are implicated, (a state evidentiary rule) may not be applied mechanistically to defeat the ends of justice." *Parisie v. Greer,* 671 F.2d 1011, 1019 (7th Cir.1982) (Cudahy, J., dissenting in part).

■ In balancing the competing interest underlying Indiana's Rape Shield Statute and the constitutional policies favoring petitioner's right to testify, this court must first closely examine the justification of the state interest. See *Chambers,* 410 U.S. at 295, 93 S.Ct at 1045. There is no doubt that Indiana has a legitimate interest in encouraging victims of sex offenses to report the crime, free of fear of being harassed or humiliated when put on the witness stand. *Moore v. Duckworth,* 687 F.2d 1063, 1065 n. 2 (7th Cir.1982). The principal reasons for the rape shield statutes is to shield victims of sex crimes from general inquiry into their past sexual conduct and to keep these victims from feeling that they are on trial. *Thomas v. State,* 471 N.E.2d 681 (Ind.1984). The state's interest of protecting the victim was carefully balanced with the petitioner's constitutional right to testify throughout the entire proceedings. The trial judge tried to carefully and moderately apply the rape shield statute by allowing the petitioner to testify to all events that he alleged occurred that evening. Petitioner was permitted to give a detailed account of his version of the facts and the only testimony that the jury

was not allowed to hear was the specific statement revealing an alleged aspect of the prosecutrix's past sexual practices. Except for the contents of the statement he was alleged to have made, the whole thrust of petitioner's version of the facts was before the jury. This court is of the opinion that the procedural limitations placed on the petitioner's right to testify were carefully balanced by the trial judge and the petitioner's Sixth Amendment right to testify was not violated.

The Indiana statute provides that if a party purposes to offer evidence of an exception, a written motion must be filed at least ten (10) days before trial containing an offer of proof showing the relevancy of the evidence in the case and accompanied by an affidavit in which the offer of proof is stated. The statute further provides that the court is to conduct a hearing and rule on the admissibility and form of the evidence at that time. Defendant did not follow that procedure, but attempted to offer the evidence at the time of trial. Clearly, counsel for petitioner took the trial judge by surprise by not following the provision of the rape shield statute that requires a party purposing to offer evidence of an exception, to file a pre-trial motion. This would appear to be a further basis for not admitting the specific details of the conversation when offered. The trial judge's decision to exclude the proffered testimony was carefully balanced and was rendered only after thoughtful application.

### Harmless Error

■ Even if this court were to find that the trial judge's exclusion of the proffered testimony violated Stephens' Sixth Amendment right to compulsory process, the court would find the error to be harmless beyond a reasonable doubt and would do so for two reasons. First, it is inconceivable that the petitioner's version of the incident could have taken place. In the fifteen minutes of time between the time Stephens arrived at the prosecutrix's trailer and the time he arrived at Jeff Strait's house, Stephens alleged that he had: (1) engaged in a conversation with the prosecutrix about her pending divorce; (2) carried her small child to bed; (3) engaged in foreplay; (4) moved furniture around; (5) undressed himself and the prosecutrix; (6) engaged in sexual intercourse; (7) redressed himself and (8) left the trailer, but did not run to the home of Jeff Strait, located several blocks away. The only testimony of the petitioner's version of the facts that was omitted was the precise substance of the conversation he alleged took place during the act of sexual intercourse. The omission of such a narrow fact would not have materially affected the jury's decision. The jury would have been hard pressed to believe this whirlwind courtship took place in a matter of fifteen minutes. It is highly unlikely that the proffered testimony would have raised a doubt about the petitioner's guilt in the minds of the jury.

Second, and probably the most damaging, was that by the time Stephens took the witness stand he had lied about what happened that evening to seven different people. He gave four different versions of the incident to his live-in girlfriend. He convinced his best friend, David Stone, to perjure himself. He gave a false report to Office Allen Bell who was investigating the incident. It never appeared that the petitioner's credibility was ever a question for the jury. This court is persuaded that no reasonable jury would have found the proffered testimony would have raised a doubt as to the petitioner's guilt. Accordingly, the erroneous ruling was harmless beyond a reasonable doubt.

### Conclusion

Accordingly, based upon the foregoing, the petitioner's Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby DENIED.