Lonnie K. STEPHENS, Petitioner–Appellant,

v.

Charles B. MILLER, Warden, and Attorney General of the State of Indiana, Respondents–Appellees.

No. 91–1690.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1992.

Decided March 26, 1993.

Reargued En Banc Sept. 8, 1993.

Decided Jan. 6, 1994.

Robert G. Forbes (argued), Forcum & Forbes, Hartford City, IN, for petitioner-appellant.

Linley E. Pearson, Atty. Gen., Matthew R. Gutwein, Pamela Carter, Asst. Atty. Gen. (argued), Suzann W. Lupton, Office of the

Atty. Gen., Fed. Litigation, Indianapolis, IN, for respondents-appellees.

Before POSNER, Chief Judge, CUMMINGS, BAUER, CUDAHY, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges.

BAUER, Circuit Judge.

This case requires us to decide whether Lonnie K. Stephens was deprived of his constitutional right to testify when an Indiana court applied Indiana's Rape Shield Statute to exclude at trial certain statements that Stephens claims he made during the events that led to his conviction. Stephens was convicted of attempted rape and the Indiana Supreme Court affirmed his conviction. *Stephens v. State*, 544 N.E.2d 137 (Ind.1989). Stephens filed a petition for writ of habeas corpus in the federal district court pursuant to 28 U.S.C. § 2254. The district court denied his petition. *Stephens v. Morris*, 756 F.Supp. 1137 (N.D.Ind.1991). Stephens appeals.

I.

On the night of March 17, 1987, Lonnie Stephens went to Melissa Wilburn's trailer. At trial, Stephens and Wilburn told vastly different stories about what happened after Stephens arrived. The events of that evening began after Stephens and David Stone finished drinking. Stone drove Stephens to Wilburn's trailer and dropped him off. Stephens and Wilburn knew each other as casual acquaintances. Wilburn was asleep on the couch when Stephens arrived, and her sister and brother-in-law were asleep in the guest room. Wilburn's son and nephew were asleep in another bedroom.

According to Wilburn, she did not lock the door before she fell asleep. She awoke and found Stephens standing in front of the door inside the trailer. Stephens sat down next to Wilburn and attempted to kiss her. Wilburn told Stephens of the others who were asleep in the trailer and called out for her sister. Stephens hesitated but, after a moment, continued his advances. Wilburn yelled one more time for her sister, but her sister again did not respond. Stephens went to the bathroom and, when he returned, angrily told Wilburn that she lied to him about the others being in the trailer. He threw her down on the couch and covered her mouth with his hand to prevent her from screaming. Stephens pressed his body against Wilburn's, undid her bra, and tore a button from her shirt. Next, Stephens reached down to undo his pants. Wilburn pushed Stephens off of her and ran screaming into the bedroom occupied by her sister and brother-in-law.

Stephens ran out the door to the nearby home of his friends, Jeff and Lisa Strait. Stephens told the Straits that he had been at a local Pic a Pac Store. Later, Stephens told that same story to the police officer who investigated the incident. Stephens directed Stone to say, if he were asked, that Stone dropped him off at the Pic a Pac. At trial, Stone first repeated the Pic a Pac story, then admitted on cross-examination that he dropped Stephens off at Wilburn's trailer. Stone also admitted that he told the Pic a Pac story pursuant to directions from Stephens.

Stephens testified at trial and painted a quite different picture of the evening's events. He claimed that Wilburn invited him into her trailer after Stone dropped him off. Stephens stated that when he entered the trailer, Wilburn's son was asleep on the couch. Stephens carried him to one of the bedrooms and Wilburn explained that her sister, brother-in-law, and their child were also asleep in the bedroom. All three slept through Stephens' visit to the trailer. Stephens and Wilburn talked in the living room, and Wilburn told Stephens he could kiss her. One thing led to another, according to Stephens, until the two of them ended up on the floor as two consenting adults engaged in sexual intercourse.

Stephens stated in an offer of proof that the two of them were "doing it doggy fashion" when he said to her "[d]on't you like it like this? ... Tim Hall said you did." Tr. 1278. Stephens also asserted that he said something to Wilburn about "switching partners." Tr. 1276. The trial court excluded these statements pursuant to the Indiana Rape Shield Statute. Ind.Code § 35–37–4–

4.[1] The court did, however, allow Stephens to testify that he said something to Wilburn that angered her and led her to fabricate the attempted rape charge. Stephens testified that after he made these statements, Wilburn ordered him to stop and leave. Stephens claimed that he did as she asked, got dressed, and left.

The jury returned a guilty verdict against Stephens on the attempted rape charge. The Indiana Supreme Court affirmed his conviction and the district court denied his petition for writ of habeas corpus.

## II.

Stephens contends that the Indiana trial court erred when it excluded the proffered testimony. First, he argues that the court misapplied the Indiana Rape Shield Statute. Second, Stephens claims that the court's application of the Indiana Rape Shield Statute violated his constitutional right to testify in his own defense. Finally, Stephens argues that the excluded testimony should be admissible as the *res gestae* of the attempted rape.

### A. Application of the Indiana Rape Shield Statute under Indiana Law

■ Stephens' first contention need not detain us long. He argues that we should grant his petition because the Indiana trial court and the Indiana Supreme Court misapplied the Indiana Rape Shield Statute under Indiana law. That may be, but whether the Indiana courts correctly applied their own law is, by itself, no concern of ours. Federal habeas actions do not lie for mere errors of state laws. *Estelle v. McGuire,* —— U.S. ——, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Reed v. Clark,* 984 F.2d 209, 210 (7th Cir.1993). We ask only whether Indiana denied Stephens his rights under the Constitution, laws, or treaties of the United States. *Estelle,* —— U.S. at ——, 112 S.Ct. at 480; *Reed,* 984 F.2d at 210. We therefore will not consider the merits of his claim that the Indiana courts misapplied their own law.

### B. Constitutionality of the Indiana Rape Shield Statute as Applied Here

■ Stephens does not challenge the facial constitutionality of the Indiana Rape Shield Statute, and for good reason. In *Moore v. Duckworth,* 687 F.2d 1063 (7th Cir.1983), we upheld the facial validity of the Indiana Rape Shield Statute. Still, although the principle of rape shield statutes has been held constitutional, both by this court and the Supreme Court in *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the constitutionality of the law as applied remains subject to examination on a case by case basis. *Sandoval v. Acevedo,* 996 F.2d 145, 149 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 307, 126 L.Ed.2d 255 (1993). Stephens claims that Indiana unconstitutionally applied its Rape Shield Statute in this case. His primary argument is that Indiana denied him his constitutional right to testify in his own defense when it did not allow him to tell his version of the events, in their entirety and in his own words, about what happened on March 17, 1987 at Melissa Wilburn's trailer. Stephens argues that the

---

1. The Indiana Rape Shield Statute provides, in pertinent part:

(a) In a prosecution for a sex crime as defined in IC 35–42–4:
(1) evidence of the victim's past sexual conduct;
(2) evidence of the past sexual conduct of a witness other than the accused;
(3) opinion evidence of the victim's past sexual conduct;
(4) opinion evidence of the past sexual conduct of a witness other than the accused;
(5) reputation evidence of the victim's past sexual conduct; and
(6) reputation evidence of the past sexual conduct of a witness other than the accused;

may not be admitted, nor may reference be made to this evidence in the presence of the jury, except as provided in this chapter.
(b) Notwithstanding subsection (a), evidence:
(1) of the victim's or a witness's past sexual conduct with the defendant;
(2) which in a specific instance of sexual activity shows that some person other than the defendant committed the act upon which the prosecution is founded; or
(3) that the victim's pregnancy at the time of trial was not caused by the defendant;
may be introduced if the judge finds, under the procedure provided in subsection (c) of this section, that it is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. Ind.Code §§ 35–37–4–4(a) and (b).

Indiana court violated the federal constitution when it excluded his statements about "doggy fashion" sexual intercourse and partner switching.

■ The Supreme Court has interpreted the Constitution to provide a criminal defendant, like Stephens, with an implicit right to testify in his or her own defense. *United States v. Dunnigan*, — U.S. —, —, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993); *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). For purposes of state criminal proceedings, like this one, the right to testify arises out of the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law," U.S. Const. Amend. XIV. The right to testify is also found in the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. It is also a "necessary corollary" of the constitutional guarantee against compelled testimony. *Rock*, 483 U.S. at 52, 107 S.Ct. at 2709. This "necessary corollary" is derived from the Fifth Amendment's mandate that "[n]o person ... shall compelled in any criminal case to be a witness against himself." U.S. Amend. V.

■ A criminal defendant's right to testify, however, is not unlimited and may bow to accommodate other legitimate interests in the criminal trial process. *Lucas*, 500 U.S. at —, 111 S.Ct. at 1746; *Rock*, 483 U.S. at 55, 107 S.Ct. at 2711. There is, for example, no constitutional right to commit perjury. *Dunnigan*, — U.S. at —, 113 S.Ct. at 1117. Furthermore, numerous procedural and state evidentiary rules control the presentation of evidence and do not offend a criminal defendant's right to testify. *Rock*, 483 U.S. at 55 n. 11, 107 S.Ct. at 2711 n. 11; *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).

■ Rape shield statutes fall into the category of procedural and evidentiary rules referred to in *Rock* and *Chambers*. Rape shield statutes, like Indiana's, represent the valid legislative determination that victims of rape and, as here, attempted rape deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy. *Lucas*, 500 U.S. at —, —, 111 S.Ct. at 1743, 1746. These statutes also protect against surprise to the prosecution. *Id.* Restrictions imposed by rape shield statutes, especially as they relate to a criminal defendant's right to testify, may not, however, be arbitrary or disproportionate to the purposes they are designed to serve. *Id.; Rock*, 483 U.S. at 56, 107 S.Ct. at 2711. Rather, the state is required to evaluate whether the interests served by the rule justify the limitation imposed on the criminal defendant's right to testify. *Id.*

In this case, Stephens was allowed to give his entire version of the facts, except for the excluded evidence. The Indiana court allowed Stephens to testify in front of the jury that he said something to Wilburn that angered her and caused her to fabricate the attempted rape charge. The court did nothing arbitrary or disproportionate to the purposes the Indiana Rape Shield Statute was designed to serve when it excluded the "doggy fashion" and "partner switching" statements. The Indiana Rape Shield Statute was enacted to prevent just this kind of generalized inquiry into the reputation or past sexual conduct of the victim in order to avoid embarrassing her and subjecting her to possible public denigration. *Tague v. Richards*, 3 F.3d 1133, 1139 (7th Cir.1993) (citing *Kelly v. State*, 586 N.E.2d 927, 929 (Ind.App. 1992) and *Thomas v. State*, 471 N.E.2d 681, 683 (Ind.1984)). Its application to exclude references here to "doggy fashion" sexual intercourse and partner switching effectuate its purpose. The Indiana trial court properly balanced Stephens' right to testify with Indiana's interests because it allowed him to testify about what happened and that he said something that upset Wilburn. The Constitution requires no more than this. The interests served by the Indiana Rape Shield Statute justify this very minor imposition on Stephens' right to testify.

We note also that Stephens and Wilburn told drastically different stories of what happened and that Stephens directed David Stone to commit perjury. The jury was enti-

tled to credit Wilburn's story, discount Stephens' account, and return a guilty verdict. Testimony about Wilburn's alleged sexual preferences would have served no other purpose than to embarrass and humiliate her. Accordingly, the Indiana trial court properly balanced the state's interests with Stephens' right to testify when it excluded the testimony at issue here.

Stephens was not deprived of his constitutional right to testify.

## C. Res Gestae

■ Stephens raises one other argument: that the excluded testimony was evidence concerning the *res gestae* of the offense and therefore should have been admitted. Literally "the thing done," the *res gestae* of a particular offense under Indiana law is admissible and is defined as evidence of happenings near in time and place which complete the story of a crime. *Atkinson v. State,* 581 N.E.2d 1247, 1249 (Ind.1991); *Beatty v. State,* 567 N.E.2d 1134, 1136 (Ind.1991). There are two problems with Stephens' *res gestae* argument.

■ First, we do not accept Stephens' *res gestae* argument because to do so would effectively gut rape shield statutes and violate the principle established in *Lucas.* If Stephens' *res gestae* argument were correct, as a matter of constitutional law, criminal defendants could always circumvent rape shield statutes by claiming that they said something near in time and place to the alleged rape or attempted rape about the victim's past sexual history or reputation.

■ Second, Stephens offers nothing, probably because nothing exists, to support his *res gestae* argument as a constitutional violation. In fact, the use of the term *res gestae,* for purposes of federal law, is essentially obsolete. The Federal Rules of Evidence, adopted in 1976, govern evidentiary questions in federal court, and, more significantly given the issue here, no court has ever

held that *res gestae* is a concept with any constitutional significance. Other federal courts have described the phrase *res gestae* as useless, harmful, and almost inescapable of a definition. *Williams v. Melton,* 733 F.2d 1492, 1494 (11th Cir.), *cert. denied,* 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); *Wheeler v. United States,* 211 F.2d 19, 23 n. 11 (D.C.Cir.1953) (quoting 6 Wigmore § 1767), *cert. denied,* 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954). *See also State v. Hafford,* 410 A.2d 219, 220–21 (Me.1980) (continued use of the term *res gestae* inappropriate under Maine law). Simply put, as a federal matter, "[t]he old catchall, 'res gestae,' is no longer part of the law of evidence." *Miller v. Keating,* 754 F.2d 507, 509 (3d Cir.1985).

We observe only that for purposes of the Constitution and federal law, the term *res gestae* is without significance. Indiana and the other states are, of course, free to keep the *res gestae* concept as part of their law of evidence. But here, as we have said, we ask only whether the Indiana court denied Stephens any right guaranteed to him by the Constitution. It did not.

## III.

Nothing in the Constitution prohibited the exclusion of the testimony at issue in this case. The district court's decision to deny Stephens' petition for writ of habeas corpus is therefore

AFFIRMED.

FLAUM, Circuit Judge, concurring.

This case forces us to confront the extreme tension if not the outright conflict between a criminal defendant's constitutional right to present evidence in his own defense[1] and a state's "sovereign prerogative" to regulate the presentation of evidence in its courts. *See Cunningham v. Peters,* 941 F.2d 535, 538 (7th Cir.1991), *cert. denied,* —— U.S. ——,

---

1. In *Rock v. Arkansas,* the Supreme Court explained that "[t]he right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution." 483 U.S. 44, 51, 107 S.Ct. 2704, 2708 (1987). The right to testify is a "necessary ingredient" of the Due Process Clause of the Fourteenth Amendment, a "necessary corollary" to the Fifth Amendment's guarantee against compelled testimony, and also is found in the Compulsory Process Clause of the Sixth Amendment. *Id.* at 51–53, 107 S.Ct. at 2708–2710.

112 S.Ct. 1484, 117 L.Ed.2d 626 (1992) (quoting *Johnson v. Chrans*, 844 F.2d 482, 484 (7th Cir.), *cert. denied*, 488 U.S. 835, 109 S.Ct. 95, 102 L.Ed.2d 71 (1988)). Though the right to present relevant testimony in one's own behalf is of constitutional dimension, it is not without limitation[2] and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Rock*, 483 U.S. at 55, 107 S.Ct. at 2711 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973)). The difficult question that we must resolve today is whether the Indiana rape shield statute curbs Stephens' ability to present arguably relevant evidence.

The Indiana rape shield statute undoubtedly advances important state interests, including (1) the protection of rape victims from public embarrassment and humiliation through exposure of their past sexual conduct, (2) the focusing of the fact-finder's attention on the defendant's alleged actions and away from marginally relevant collateral issues, and (3) the encouragement of rape reporting by victims. Further, this court has upheld the facial validity of the Indiana rape shield statute, *see Moore v. Duckworth*, 687 F.2d 1063 (7th Cir.1983), and although the Supreme Court has not yet confronted this question squarely, the Court has issued strong dicta indicating that rape shield statutes probably would survive facial challenges. *See Michigan v. Lucas*, 500 U.S. 145, ——, 111 S.Ct. 1743, 1746, 114 L.Ed.2d 205 (1991) (holding that preclusion of evidence of defendant's own past sexual conduct with the victim, because of defendant's failure to comply with notice-and-hearing requirements of Michigan's rape shield statute, was not a *per se* violation of the Sixth Amendment). In *Lucas*, the Court noted that Michigan's rape shield statute "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." *Id.* 500 U.S. at ——, 111 S.Ct. at 1746 (majority opinion); *see also id.* 500 U.S. at ——, 111 S.Ct. at 1749 (Blackmun, J., concurring).

While I believe that the relevant Supreme Court and Seventh Circuit precedents indicate that the typical rape shield statute should survive facial attack, in this case we must consider whether it is constitutionally permissible to apply the Indiana rape shield statute to preclude a defendant from giving a full exposition of his version of the events surrounding the crime of which he was accused. *See, e.g., Tague v. Richards*, 3 F.3d 1133, 1137 (7th Cir.1993); *Sandoval v. Acevedo*, 996 F.2d 145, 149 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 307, 126 L.Ed.2d 255 (1993). On several occasions, the Court has endorsed a balancing test for resolving conflicts between the government's interest in maintaining its evidentiary rules and the accused's interest in presenting relevant evidence in his defense. *See, e.g., Rock*, 483 U.S. at 55, 107 S.Ct. at 2711; *Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974); *Chambers*, 410 U.S. at 295, 93 S.Ct. at 1045; *Johnson*, 844 F.2d at 484. As Judge Cudahy points out, "our efforts at striking this balance should be sensitive to the guidance that Supreme Court precedent provides." *Post*, at 1012 (Cudahy, J., dissenting). Unfortunately, when one examines the relevant Supreme Court authority mandating a balancing test, one must conclude that the Court has yet to formulate a clear standard for determining when a governmental interest is sufficiently important to outweigh the accused's interest in presenting relevant testimony. *See* Joan L. Larsen, Comment "Of Propensity, Prejudice, and Plain Meaning: The Accused's Use of Exculpatory Specific Acts Evidence and the Need to Amend Rule 404(b)," 87 *Nw.U.L.Rev.* 651, 675–676 (1993). Hence, we must infer an approach that appropriately balances the competing interests at stake in this case.

Recognizing the absence of a well-defined standard, I believe that the Court's recent cases involving rape shield statutes and analogous areas of Sixth Amendment jurisprudence incline toward a contraction of the unfettered right to present evidence and the closely related right of confrontation. In

---

**2.** *But see infra* note 3 and accompanying text discussing the dissenting opinion of Justice Scalia, joined by Justices Brennan, Marshall, and

Stevens, in *Maryland v. Craig*, 497 U.S. 836, 860, 110 S.Ct. 3157, 3171, 111 L.Ed.2d 666 (1990).

*Lucas,* the Court noted that the operation of a procedural provision of Michigan's rape shield statute to exclude the presentation of relevant evidence is not necessarily unconstitutional even though it in effect diminishes the defendant's ability to confront adverse witnesses and present a defense. *See* 500 U.S. at ——, 111 S.Ct. at 1746. While the Court long has recognized that Sixth Amendment rights "must be interpreted in the context of the necessities of trial and the adversary process," *Maryland v. Craig,* 497 U.S. 836, 850, 110 S.Ct. 3157, 3166, 111 L.Ed.2d 666 (1990) (listing cases in which states' interests in orderly trial procedures did not violate defendants' Sixth Amendment rights), the Court only recently has relied on articulated state interests *external* to the trial process to uphold a limitation on the scope of a defendant's presentation of evidence at trial. In *Craig,* a sharply divided Court held that the Confrontation Clause of the Sixth Amendment did not categorically prohibit a child witness in a child abuse case from testifying outside the defendant's physical presence by one-way closed circuit television.[3] *Id.* at 853, 110 S.Ct. at 3167. *Craig* directs us to continue applying a case-specific balancing test, and it indicates that policy interests external to the trial process, such as those embodied by rape shield statutes, may outweigh, in some select and limited cases, a defendant's completely unfettered Sixth Amendment rights.[4]

Whether a state interest can justify a limitation upon a defendant's right to present relevant evidence depends upon the relative weights of the interest and the evidence. A state may not "mechanistically" apply its evidentiary rules to deprive the defendant of a fair trial, and "critical" evidence may not be excluded. *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049. As the Court stated in *United States v. Valenzuela-Bernal,* evidence is "critical" if it is "*relevant* and *material,* and ... *vital* to the defense" to a degree sufficient to establish that the exclusion of the evidence could have "affected the outcome of the trial." 458 U.S. 858, 867–868, 102 S.Ct. 3440, 3446–3447, 73 L.Ed.2d 1193 (1982) (citations omitted) (emphasis in original); *see also Sharlow v. Israel,* 767 F.2d 373, 377–378 (7th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986) (holding that state evidentiary rule (hearsay) was not "mechanistically" applied because the testimony excluded was not "critical" to the defense). More recently, the Court has indicated that state restrictions on an accused's right to present a defense "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Lucas,* 500 U.S. at ——, 111 S.Ct. at 1747 (citing *Rock,* 483 U.S. at 56, 107 S.Ct. at 2711). In my judgment the application of the rape shield statute in this case neither likely affected the

---

**3.** Justice Scalia, joined by Justices Brennan, Marshall, and Stevens, wrote a strong dissent in *Craig* that began as follows:

> Seldom has this Court failed so conspicuously to sustain a categorical guarantee of the Constitution against the tide of prevailing current opinion. The Sixth Amendment provides, with unmistakable clarity, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The purpose of enshrining this protection in the Constitution was to assure that none of the many policy interests from time to time pursued by statutory law could overcome a defendant's right to face his or her accusers in court.

497 U.S. at 860–861, 110 S.Ct. at 3171 (Scalia, J., dissenting). Justice Scalia's textual approach has considerable force and obviously would eliminate the difficulty of applying the murky balancing test we now must employ to resolve conflicts between a defendant's rights to testify and to cross-examine witnesses and the various state statutes that restrict these rights. But ours is a hierarchical judiciary, and Justice Scalia's view, whatever its appeal, has not prevailed. Thus, until we receive further guidance from the Court, we must endeavor to define and apply a standard that balances the competing interests.

**4.** In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Court balanced a criminal defendant's right to cross-examine adverse witnesses against a state interest external to the trial process—namely, preserving the anonymity of juvenile offenders. The *Davis* Court resolved the balancing of interests in favor of the defendant's right to cross-examine. The case at bar is similar to both *Davis* and *Craig* in that the statutes in all three cases sought to shelter persons whom the legislature deemed particularly vulnerable (rape victims, juvenile offenders, and child abuse victims) from further trauma and embarrassment. However, this case and *Craig* present an additional important state interest— the reporting and prosecution of sex offenses— not found in *Davis.*

outcome of the trial nor could fairly be labelled arbitrary or disproportionate to the purposes of the statute in light of the High Court's recent decisions.

There can be no real question that Stephens' proposed testimony about the reputation and past sexual practices of the victim is of the kind that rape shield statutes are designed to exclude. Neither can there be any doubt that the proposed testimony in this case was linked to Stephens' effort to challenge the complainant's credibility, an inquiry to which he was constitutionally entitled. But while the opportunity for such an attack may not be denied him *in toto*, it is clear to me that after *Craig* and *Lucas* the State may in limited circumstances regulate the breadth of the assault. From this I must conclude that rape shield laws in particular now carry an implied judicial imprimatur of approval and undoubtedly represent a pivotal legislatively-driven circumscription of a criminal defendant's right to muster relevant evidence for his cause.

Nonetheless, if constitutional jurisprudence has crossed this legal rubicon, it must settle at a principled resting place. That is, once it is acknowledged that a defendant's right to tell his story is not boundless, one is compelled to seek the broad and elemental contours of this right that *are* inviolate. As an initial matter, it is apparent that a defendant cannot be denied the opportunity to elicit the core of operative facts that comprise his theory of defense. In a rape case, where the defendant asserts the defense of consent, this essential center certainly would include both the facts that arguably manifest consent and those that diminish the credibility of inculpatory evidence accumulated against the defendant. More germane to this case, but related in principle, is the notion that a defendant's opportunity to develop not only the rudiments but also the details of his story cannot be so cramped as to leave his defense drained of its effectiveness. Ascertaining which details are essential in a particular case admittedly may be an exacting and imprecise examination. However-

er, until we are benefitted by further teachings of the Supreme Court, I conclude that this is the inquiry that should be conducted.

In this case, I cannot adopt the majority's characterization that the application of the rape shield statute constitutes a "very minor imposition on Stephens' right to testify." *Ante* at 1002. Nevertheless, I accept that Stephens' testimony was appropriately excludable because the testimony was not sufficiently central to his defense to outweigh the interests served by the statute. First, I do not find this case akin to *Chambers*, where the Court invalidated a hearsay rule that barred the defendant from introducing evidence that, if believed, necessarily would have exculpated the defendant.[5] Here the excluded evidence could have been the basis of an inference helpful to Stephens' defense, but it was not shown to be connected to the issue of guilt or innocence to a degree sufficient to establish that its exclusion impacted Stephens' ability to set out his version of events and thus affected the outcome of the trial. Second, Stephens *was* able to impeach the complainant's credibility with the suggestion that she may have been angry with him, although not in the detail he would have liked. Furthermore, in my opinion this loss of detail did not constrict significantly the vitality of Stephens' defense. Even if believed, the proposed testimony, while relevant to witness bias, is hardly of the sort that would constitute persuasive evidence that the complainant concocted her story. Any link between Stephens' comments and a decision by the complainant to fabricate a charge of rape was merely conjectural. In this regard, I find it noteworthy that Stephens did not attempt to lessen the potential impact of the loss of the excluded testimony by proffering modified versions of the controversial comments. Such an effort would have given meaningful support to the proposition that the precluded comments were vital to his defense. The decision to rest on the possible error of the trial judge does not suggest intense concern over the significance of the testimony.

---

**5.** In *Chambers,* the excluded evidence consisted of a confession by another person to the murder for which the defendant was tried. This evi-

dence was patently critical, and therefore could not be excluded.

In the final analysis, after reviewing the direction given by the statute and contemporary case law, and under the specific circumstances of this case, I am constrained to concur in the decision to affirm the district court and cabin any inclination to chart another constitutional course.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

Although several of the opinions in this case are quite compelling in their discussion of a difficult constitutional issue, I do not believe that they address the case actually before us. I therefore write separately to explain my view of the issue this case presents—one, I hasten to add, that raises less weighty constitutional concerns than those with which my colleagues have struggled.

My colleagues' opinions all start from the premise that Stephens offered the excluded testimony for the purpose of impeaching the complaining witness, Melissa Wilburn. They assume Stephens' theory to have been that the offensive statements so angered Wilburn that she was prompted to fabricate the charge of attempted rape. *See* Plurality Op. at 1001; Flaum, J., concurring, at 1006–07; Cummings, J., dissenting, at 1009–10; Cudahy, J., dissenting, at 1011; Coffey, J., dissenting, at 1018; Ripple, J., dissenting, at 1020–21, 1023. The content of the remarks was therefore important because the jury would have been unable to fairly assess Stephens' theory without knowing whether the comments were sufficiently inflammatory to cause such a reaction. Based on this understanding, the dissenters have argued that denying Stephens the opportunity to present the testimony has significantly interfered with his constitutional rights. He has, in their view, been prohibited from offering evidence that goes to the heart of his defense, and he has been denied his right to confront an adverse witness. *See* Cudahy, J., dissenting, at 1012–14; Ripple, J., dissenting, at 1020–21, 1023; *cf.* Flaum, J., concurring, at

1006. As the numerous opinions suggest, balancing those weighty interests against the state's interest in excluding the testimony makes for a very difficult case.

But this case does not, in my view, actually raise such troubling questions because, under Stephens' own theory of the case, the evidence was neither central to his defense nor offered for the purpose of impeaching Wilburn. Contrary to my colleagues' assumption, Stephens did not offer the evidence to support a theory of fabrication, but only to explain why Wilburn had withdrawn her previously-given consent. His only reference to the excluded comments during closing argument makes that clear: [1]

> Lonnie says, something that he said, she told him stop, he stopped. She told him to leave, he left.

(Oct. 23, 1987, Tr. at 58).[2] Although Stephens did argue that Wilburn had invented the charges, his fabrication theory was not related to Wilburn's anger, but focused instead on her desire to placate her landlady's concerns about the disturbance that had transpired. As his lawyer argued in closing:

> [W]e're talking about two and a half hours and an explanation for why she did finally report it to the police. Because she wanted to get out of trouble with her landlady, whether her landlady ... her landlady is a nice person, she's not going to throw somebody out just because somebody attempted to rape me, but the way she phrased it to her, you have to control it, Melissa believed she had to do something, she has to do something to show this lady, it's not my fault. Glenn Wilburn was there and that's the reason they came down so I'll do something, I'll go make the report.

(*Id.* at 60.)

Even more significantly, Stephens' offer of proof reflects the same theory.[3] Outside the

---

1. Stephens' lawyer did not set out his theory of the case during opening argument, so we must rely solely on his closing argument.

2. Stephens' lawyer also alluded to Wilburn's purported anger later in his closing argument:
   She says that they stayed up, she was fearful of him coming back, she got Mary Riley up be-

cause she was mad, she was upset, her sister is someone she talks to....
(*Id.* at 63).

3. It is at least arguable that Stephens' approach at closing was determined after the testimony

presence of the jury, Stephens' lawyer elicited this testimony from his client:

> I said, I can't say exactly what I said but I said something to the effect, we was doing it and I said that, referred to Tim Hall and Drema and that they, I had mentioned something about them switching partners and she was, it was the fashion we was doing it and she didn't particularly care for what I said and she told me to quit.

(R. 1277.)[4] After stating the content of the offensive comments, Stephens continued:

> And she said, "What did you say?" And I said, and she asked me what I meant by that and I told her and she said, "Stop," and that's when I stopped and she said, "Get out of my house." That's exactly what I said.

(R. 1278.) This testimony again reflects Stephens' theory that the comments had motivated Wilburn to withdraw her consent.

The subsequent colloquy between the attorneys and the court also indicates that Stephens' comments and Wilburn's resulting anger were relevant under Stephens' theory only to explain why Wilburn had withdrawn her consent and asked him to leave:

> [Prosecution]: We would like no further questions directed toward the conversation, that's misleading, that's twice now.
>
> [Court]: Right, the Court will further sustain that, it's up to the point, you know, when you get to that point before you ask what was said next and then, you know, coming up to offer to prove, you know, *was there some reason you stopped.* Let's do the offer to prove before you get into those statements leading up because we're just cutting him right off.

had been excluded, but the offer of proof suggests that the theory of defense was consistent throughout the trial.

**4.** Record citations are to page numbers in the state court record.

**5.** Stephens did allude to that rationale for the first time in a post-trial "Motion to Correct Errors," which stated:

> The purpose behind offering such testimony was that it would tend to support the theory

[Defense]: But your honor, you know, I'm cutting it off before I bring up anything about the evidence but I can't even say that, did you say something that made her angry? I can't even point that out to them?

[Prosecution]: Then get to the point when she got angry and he left.

\* \* \* \* \* \*

[Prosecution]: We're at the point where she gets mad and he's leaving so we're done.

(R. 1279–81) (emphasis added). It was thus clear to all present that the only purpose of the testimony was to show why Wilburn had withdrawn her consent. At no time during trial did Stephens suggest that the evidence was relevant to support a theory of fabrication.[5]

Nor has Stephens suggested in his argument before this court that the testimony had that significance. His brief before the en banc court stated:

> Stephens['] contention is that the offered testimony is evidence concerning the *res gestae* of the offense. It was offered to show what occurred at the time and place of the alleged offense *not* what the past sexual conduct of the prosecutrix had been.

(Stephens En Banc Br. at 5) (emphasis in original). Indeed, Stephens' answer to the state's petition for rehearing explicitly *denied* that the testimony had been offered in order to demonstrate that Wilburn had a motive to fabricate the attempted rape charge:

> [T]he State has mischaracterized the purpose of the testimony. While the excluded testimony would have been important in showing the source of the alleged victim's

that there was another reason why the prosecuting witness had filed charges against the defendant and that it was necessary to complete the defendant's version of the events. But that first mention of the theory was of course too late to bring it into consideration. A defendant cannot advance one reason for admitting evidence during trial and then advance a wholly separate basis for admission in post-trial submissions or on appeal. An evidentiary rationale not raised before the trial judge at the time of ruling is waived. *United States v. Biesiadecki,* 933 F.2d 539, 544 & n. 1 (7th Cir.1991).

anger toward the defendant and thus her underlying motive for fabricating a rape charge against the defendant, it is undeniable that the precipitating event for the filing of the charge was something else entirely. It is undisputed that the alleged victim reported an attempted rape by the defendant in order to placate her landlady who was upset that the police had been called to the trailer.... Furthermore, in [his] Reply Brief, the defendant stated the following: "The **primary** relevance of the excluded testimony is that it shows why Wilburn ordered Stephens from her trailer and awakened her sister."

\* \* \* \* \* \*

While the primary purpose of the offered testimony was made clear in the brief of the defendant and was then made even more abundantly clear in the Reply Brief, the Supreme Court of Indiana chose to ignore those assertions and state that the statements made by the defendant to the alleged victim "made her so angry she pursued the attempted rape charged against him."

(Answer at 6–7) (emphasis in original) (footnote and citations omitted).[6]

As my colleagues have noted, the constitutional analysis in this case requires us to balance the state's interest in excluding the testimony against Stephens' interest in its admission. The analysis therefore depends entirely on the purpose for which the testimony was offered. Fortunately, we need not decide whether excluding evidence offered to show that the complaining witness was lying is unconstitutional. The only question raised here is whether Stephens should have been allowed to introduce otherwise inadmissible evidence in order to show the precise content—rather than the general nature—of a comment that prompted Wilburn to withdraw

her consent. That does indeed seem a more "minor imposition" than the one my colleagues have discussed. It neither goes to the heart of Stephens' defense nor limits his ability to confront adverse witnesses.

Stephens' interest in introducing the testimony for the limited purposes that he envisioned may, in my view, properly be subordinated to the State's interest in excluding the evidence. I therefore concur in the decision to affirm the district court's denial of Stephens' petition.

CUMMINGS, Circuit Judge, joined by CUDAHY and MANION, Circuit Judges, dissenting.

Lonnie Stephens claims that on the night of March 17, 1987, he made comments to the complainant that caused her to end their consensual sexual encounter, send Stephens immediately from her home, wake her sister, and the next day to file a groundless charge of attempted rape. The content of the offending statement—a cornerstone of Stephens' case—was never presented to the jury, the trial judge having ruled that the proposed testimony was barred by the Indiana Rape Shield Statute, Ind.Code Ann. § 35–37–4–4 (Burns 1985). The exclusion of this evidence indisputably gives rise to a colorable claim that the application of an evidentiary rule, the rape shield statute, has interfered with the defendant's right to present his defense. When a defendant presents such a colorable claim, the task of the court is to balance the exculpatory import of the excluded evidence against the interest of the state manifested in the rule at issue. See *Johnson v. Charns,* 844 F.2d 482, 484 (7th Cir.), certiorari denied, 488 U.S. 835, 109 S.Ct. 95, 102 L.Ed.2d 71 (1988); *McMorris v. Israel,* 643 F.2d 458, 461 (7th Cir.), certiorari

---

6. The same brief later suggests that impeachment may have been a secondary purpose for offering the testimony. Quoting a district court filing, Stephens writes:

  [The defendant] will accept that the alleged victim's anger over his statements may have contributed to her filing an attempted rape charge; however, that was not his primary purpose in offering the testimony.

(*Id.* at 8.) The brief also later characterizes the original panel opinion—which had concluded

that the testimony was offered to show why Wilburn withdrew her consent *and* why she fabricated rape charges—as "incorporating **both** purposes for introduction of the evidence." (*Id.* at 9) (emphasis in original). But these comments cannot overcome Stephens' waiver of the argument by explicitly disclaiming it in the same brief and, even more importantly, by failing to timely make it before the trial court.

denied, 455 U.S. 967, 102 S.Ct. 1479, 71 L.Ed.2d 684 (1982).

The interests served by the Indiana Code § 35–37–4–4 are obvious—and substantial. The Indiana Rape Shield Statute furthers laudable and pragmatic goals. It protects victims from needless exposure of their past sexual conduct; ensures that the focus of rape trials remains the guilt or innocence of the accused rather than the sexual history of the complainant; and, by reducing the embarrassment and anguish of trial, encourages victims to report rapes. Without the protection provided by rape shield statutes, victims may find trial an ordeal not worth enduring. Cf. 124 Cong.Rec.H. 11944 (1978) (statement of Rep. Holtzman); Fed.R.Evid. 412 cmt. (1993) ("[M]any [rape victims] find trial almost as degrading as the rape itself. . . ."). Moreover, Indiana has the power to pursue these goals through evidentiary rules—it is each state's "sovereign prerogative" to regulate the presentation of evidence in its courts. *McMorris,* 643 F.2d at 460. Indiana's rape shield statute is a valid legislative determination that rape victims deserve heightened protection from harassment and unnecessary explorations into their personal life, cf. *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205, and exceptions to it should not be carved out liberally. Nonetheless, the desire to shield rape victims from harassment must yield in certain cases to another vital goal, the accused's right to present his defense. Sending the innocent to jail, or depriving the guilty of due process, is not a price our Constitution allows us to pay for the legitimate and worthy ambition to protect those already victimized from additional suffering. Though relevant and competent evidence may properly be excluded to accommodate other legitimate interests, *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297, evidence with genuine exculpatory potential must be admitted. See *Sharlow v. Israel,* 767 F.2d 373, 377–378 (critical evidence may not be excluded); cf. *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049. In the end then, what matters here—and what must be weighed against Indiana's policy choice—is the significance of the contested evidence to Lonnie Stephens' case.

The jury in this case heard conflicting accounts of the events that occurred at the complainant's house trailer: she testified that Lonnie Stephens was an unwelcome guest who attempted to rape her; Stephens testified that he and the complainant were engaging in consensual sex, but that in response to statements he made during intercourse she became angry, ended the encounter, ordered him to leave and fabricated a rape allegation in retaliation. The prosecution offered physical and testimonial evidence tending to corroborate complainant's version. Stephens' account consisted primarily of his own testimony. The plausibility of Stephens' defense turned in substantial part on whether the jury could be persuaded that something Stephens had said to the complainant could have so enraged her that she would have responded in the manner he alleged. Central to Stephens' case then are the words he claims to have said that night, words the jury never heard. Stephens proposed to testify that while he and the complainant were engaged in intercourse "doggy fashion," he said to her "Don't you like it like this? . . . . Tom Hall said you did." (Trial Tr. at 1278).* Stephens instead was permitted only to testify without elaboration that he had said *something* that angered the complainant. The judge required Stephens to convince the jury of the truth of his story without allowing him to reveal the fragments on which its plausibility turned. He was asked to counter the detailed and vivid depiction offered by the prosecution with a version whose essential elements had been expunged. The jury might well have disbelieved Stephens' testimony even if he had testified fully; however, it is hard to imagine his story being believed absent this evidence.

The majority is dismissive of the significance of Stephens' statements to his defense—the exclusion is but a "very minor burden" on Stephens (p. 1002). Stephens, according to the majority, is not harmed by the exclusion because he "was allowed to give [the rest of] his [ ] version of the facts" (p.

---

* There was also a statement in the offer of proof apparently alleging that defendant reminded the complainant that she had switched sexual partners with Drema _____ and Tom Hall.

1002) and little was expurgated. That Stephens was allowed to present the rest of his defense, however, is irrelevant to the question of whether the excluded evidence was in itself important. At issue is not whether Stephens was allowed to present *some* defense, but whether the Sixth Amendment requires that he be allowed to present the specific evidence excluded. Since the majority has failed to explore the exculpatory significance of the excluded evidence, it is not surprising that it concludes that the exclusion of Stephens' testimony is not "disproportionate to the purposes [of] the Indiana Rape Shield Statute" (p. 1002)—the majority has weighed only one of the issues to be balanced.

Moreover, I do not believe that allowing the evidence at issue would undermine the operation of the Indiana Rape Shield Statute. The statute may, consistent with the Sixth Amendment, operate to exclude a significant body of evidence—likely the type of evidence with which the drafters of the legislation were most concerned. Prohibited still is evidence suggesting that because of an alleged victim's past sexual conduct she probably consented this time or "asked" to have intercourse or other argument that seeks to explain or excuse a rape based on the victim's past behavior. (The Indiana Statute does allow introduction of evidence of the victim's past sexual conduct with the defendant, Ind. Code § 35–37–4–4(b)(1).) Admittedly, allowing Stephens' testimony would create an exception to the statute, but the exception is a narrow one. That Stephens allegedly uttered these comments during the evening in question is not alone sufficient to compel admission. The Sixth Amendment does not create a broad *res gestae* exception to rape shield statutes. Neither does the Sixth Amendment require that the statements be admitted because they have some tendency to. aid Stephens' defense. *Chambers,* 410 U.S. at 295, 93 S.Ct. at 1045 (relevant and competent evidence may be excluded). Rather, Stephens' statements must be admitted here because they are central to his defense.

This is not to say that the purpose of the rape shield statute would not be frustrated at all by the admission of Stephens' offered testimony. Although admitting Stephens' statement is unlikely to transform the trial into an inquiry into the complainant's private life, she would undoubtedly suffer some anguish and embarrassment—anguish and embarrassment from which Indiana, in the cause of encouraging victims to report assaults, has an interest in protecting her. However, the state's interest in allowing rape victims to testify "free of embarrassment and with [their] reputation unblemished must fall before the right of [the defendant] to seek out the truth in the process of defending himself.... [T]he State cannot ... require [the defendant]. to bear the full burden of vindicating the State's interest[s]...." *Davis v. Alaska,* 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347.

Allowing Stephens' testimony acknowledges that because the protection of defendants' rights is fundamental to our system, at times other interest may be impaired. Given the significance of the excised testimony to his case, Indiana's interests must yield to Stephens' fundamental constitutional right to present his defense. I, therefore, respectfully dissent.

CUDAHY, Circuit Judge, dissenting.

I.

I entirely agree with Judge Cummings that rape shield laws serve a necessary and laudable purpose; on this score as well as on the other issues he has addressed, I join Judge Cummings' persuasive dissent. As President Carter noted when he signed the legislation creating the federal rape shield law, embodied in Federal Rule of Evidence 412, such statutes are "designed to end the public degradation of rape victims and, by protecting victims from humiliation, to encourage the reporting of rape." 14 *Weekly Compilation of Presidential Documents* 1902 (Oct. 30, 1978).

I, however, further agree that in the present circumstances the important (but here somewhat attenuated) interests protected by Indiana's rape shield law must give way to the defendant's right to put on a defense, The central problem to which rape shield

legislation is addressed was the common law practice in which courts "considered the victim's character for chastity pertinent to whether or not she consented to the act that led to the charge of rape." Vivian Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 Colum.L.Rev. 1 (1977). The testimony that Stephens sought to offer, however, neither sought to prove the victim's character nor was intended to address the question of consent. Rather than attempting to prove the truth of any matter about Wilburn's character, Stephens ostensibly wanted to offer his story to show its effect on the listener. This, of course, is a common distinction in the law of evidence. *See generally* 6 John Henry Wigmore *Evidence* § 1789 (Chadbourn Rev.1976). Nor was Stephens' testimony intended as evidence of consent, but rather it is evidence of a motive to fabricate. Stephens' theory was that what he said so enraged Wilburn that it led her to concoct a rape charge.[1]

None of this suggests that there is any merit to Stephens' claim that he is entitled to habeas relief on the grounds that the Indiana Supreme Court misapplied state law. The Indiana Supreme Court's definitive construction of the state's statute is, as far as the federal courts are concerned, a correct interpretation of state law. *See Murdock v. Memphis*, 87 U.S. (20 Wall.) 590, 22 L.Ed. 429 (1875). But whether the state court gets the state law right or wrong, a defendant is entitled to a writ of habeas corpus only if he is held in custody "in violation of the Constitution or laws ... of the United States." 28 U.S.C. § 2254(a). But, because the scope of a defendant's constitutional right to testify on

his own behalf requires a weighing of the relevant interests, it is important to recognize that the state's interest here is not, as the majority would have it, the very interest that undergirds all rape shield legislation. Maj. at 1003.

A criminal defendant's right to testify on his own behalf is a part of his larger right to call witnesses and present evidence in his defense. *See Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987). The right to offer the testimony of witnesses is "in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.... This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

But the defendant's right to present the testimony of witnesses is not boundless. Rather, as the majority explains, it may be required to bow to other legitimate interests. Maj. at 1002. It is therefore clear that rape shield laws are constitutional, at least when applied to prevent a defendant from introducing—as proof of consent—evidence of the victim's sexual history or reputation. *See Moore v. Duckworth*, 687 F.2d 1063 (7th Cir.1982); *cf. Michigan v. Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (upholding a procedural requirement of Michigan's rape shield law as against constitutional challenge).

But the balance is a delicate one, far more delicate than the majority's somewhat curso-

---

1. There is some force to the suggestion that this evidence was not introduced *solely* to show a motive to fabricate but also to explain why Wilburn withdrew her consent and threw Stephens out of the trailer. In fact, Stephens' counsel also suggested that in addition to being upset by Stephens' remarks, Wilburn fabricated the rape charge in order to appease her landlady who was upset by the disturbance. But the Indiana Supreme Court, in reviewing the state court proceeding, found that Stephens sought to introduce the evidence to show *both* the reason why he was thrown out of the trailer *and* as a motive to fabricate. "[According to Stephens] she became so angry she made him stop and leave. He claimed her anger caused her to bring this criminal action against him." *Stephens v. State*, 544

N.E.2d 137, 138–39 (Ind.1989). The district court on habeas review did not take issue with the state court's description of its proceedings, adding that Stephens further argued that because he was not allowed to introduce the evidence, "he was precluded from presenting his argument to the jury with regard to how the evidence was important." *Stephens v. Morris*, 756 F.Supp. 1137, 1141–42 (N.D.Ind.1991). While the record does not make clear how prominent a role the excluded evidence would have played in Stephens' defense, I am inclined neither to reject the description of Stephens' defense offered by each of the courts previously to review the proceeding nor to hold Stephens to a higher standard of clarity.

ry treatment would suggest. Moreover, our efforts at striking this balance should be sensitive to the guidance that Supreme Court precedent provides. To this end, cases addressing the right to cross-examine witnesses provide a useful benchmark, since the Court has recognized that a defendant's dual rights to cross-examine the prosecution's witnesses and to bring forward his own evidence serve similar interests. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense." *Washington,* 388 U.S. at 19, 87 S.Ct. at 1923; *see also* Peter Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases,* 91 Harv.L.Rev. 567 (1978).

In particular, the Court's decision in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), is instructive here. The Supreme Court there balanced a criminal defendant's right to cross-examine adverse witnesses against a state's interest in protecting the anonymity of juvenile offenders. In *Davis,* the key prosecution witness was, at the time of trial, on probation by order of a juvenile court. The defendant sought to cross-examine the witness, suggesting to the jury that his probationary status might lead him to curry favor with the prosecutor's office, and might thereby be a source of bias. The trial court—ultimately to be affirmed by the Alaska Supreme Court—refused to allow the cross-examination. According to the trial court, the introduction of such evidence was forbidden by a state law protecting the anonymity of juvenile offenders. The state insisted that this law did not deprive the defendant of his Sixth Amendment rights, citing the state's interest in sheltering juvenile offenders from embarrassment and injury to reputation. The Supreme Court, however, struck the balance otherwise. It held that the defendant's interest in using this evidence—to suggest that the witness had a motive to lie—outweighed the state's interest in protecting the witness's reputation. Since *Davis,* the Court has consistently reaffirmed a defendant's right to introduce evidence suggesting that a witness had a motive to fabricate. *See Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam).

The analogy between *Davis* and the instant case is compelling. As in *Davis,* Stephens sought to show that the prosecution witness had a reason to lie. In addressing a constitutional challenge to rape shield legislation, "*Davis* is clearly apropos when the rape victim's prior sexual conduct has some relevance to establish a *motive for false accusation.*" 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5387, at 568 (1980) (emphasis added). "*Davis* compels the courts to 'carve a fairly broad exception [for bias impeachment] in statutes generally barring proof of sexual history.'" Edward J. Imwinkelreid, *Exculpatory Evidence* § 8–7, at 199 (1990) (citation omitted).

As far as I have discovered, every court that has applied *Davis* and its progeny to rape shield legislation has found that such laws cannot be invoked to prevent a defendant from introducing evidence that a prosecution witness had a motive to fabricate.[2] *See United States v. Stamper,* 766 F.Supp. 1396 (W.D.N.C.1991), *aff'd sub nom. without op. Re One Female Juvenile Victim,* 959 F.2d 231 (4th Cir.1992) (evidence that victim previously admitted to falsely accusing her mother's boyfriend of sexual molestation must be admitted where victim claims that her father's friend molested her); *Lewis v. State,* 591 So.2d 922 (Fla.1991) (evidence of victim's sexual activity to be admitted where victim lied to her mother about her sexual activity and accused her stepfather of rape only days before gynecological examination, scheduled by her mother, to determine whether daughter was sexually active); *State v. DeLawder,* 28 Md.App. 212, 344 A.2d 446 (1975) (evidence that victim was sexually active must be admitted where victim allegedly accused defendant of rape out of fear of telling her mother that she was pregnant);

---

2. The majority, of course, avoids this question by simply overlooking *Davis* and the particularized constitutional right to present evidence that attacks the credibility of prosecution witnesses.

*State v. Jalo,* 27 Or.App. 845, 557 P.2d 1359 (1976) (evidence of victim's sexual conduct to be admitted where ten-year-old victim engaged in sexual conduct with defendant's 13 year-old son, and allegedly accused defendant of attempted rape after defendant told victim that he would tell her parents). *Cf. Sandoval v. Acevedo,* 996 F.2d 145 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 307, 126 L.Ed.2d 255 (1993) (declining to decide—in light of its finding that any error was harmless—whether the Confrontation Clause entitles defendant to impeach victim's own statements about her sexual history); *Wood v. Alaska,* 957 F.2d 1544, 1550 (9th Cir.1992), quoting *Davis,* 415 U.S. at 318, 94 S.Ct. at 1111 (while a defendant has a constitutional right to cross-examine witnesses to show the jury facts from which the jurors " 'could appropriately draw inferences relating to the reliability of the witness,' " the fact that here the victim "posed in the nude or acted in pornographic performances does not in any way indicate that she is a dishonest person or had a motive to lie in this case").

But this is not to say that a defendant has a constitutional right to trot out a witness' sexual history whenever he claims that this history gives rise to a motive to fabricate. The constitutional right under *Davis* should outweigh the state's interest in protecting rape victims only where the proffered evidence, if true, would plausibly provide the witness with a reason to contrive a rape charge. Some courts appear to have lost sight of this fact. For example, in *Chew v. Texas,* 804 S.W.2d 633 (Tex.App.1991), *pet. for discretionary rev. ref'd* (July 3, 1991), the court concluded that under *Davis,* the defendant had a Sixth Amendment right to introduce evidence that the victim suffered from the illness of nymphomania, and therefore "had a motive to lie initially about her lack of consent to hide her sexual affliction from the public." *See also Winfield v. Commonwealth,* 225 Va. 211, 301 S.E.2d 15, 21 (1983) (evidence that victim had extorted money from those with whom she had sexual relations somehow found to be "relevant and probative of a motive to fabricate"). Similarly, in *Commonwealth v. Joyce,* 382 Mass. 222, 415 N.E.2d 181, 187 (1981), the court concluded that the defendant had a constitutional right to show that the victim was a prostitute, on the theory that such activity had something to do with her motive to lie. According to the court, the victim, who was found naked in a car with the defendant, may have been "motivated falsely to accuse the defendant of rape by a desire to avoid further prosecution." *Id.* For one, such an approach "broadly applied, denies sex workers who dare to complain of sexual violence the presumption of innocence." Mary Joe Frug, *A Postmodern Feminist Legal Manifesto (An Unfinished Draft),* 105 Harv. L.Rev. 1045, 1057 (1992). Moreover, uncritical acceptance of a defendant's every claim that the victim's sexual history relates to a motive to lie would expand a defendant's right to present a defense—and by the same token undermine the purposes behind rape shield legislation—far beyond the bounds contemplated by the Supreme Court's decisions in *Davis, Van Arsdall,* or *Olden.* A defendant has a constitutional right to introduce evidence of the victim's sexual history only where the court finds it at least plausible that this history could in some way relate to a motive to fabricate.

To do otherwise runs the risk that the narrow exception for evidence of motive to fabricate swallow the entire rape shield law. This would be the result, of course, if a court were to conclude that the fact that a victim was sexually active somehow made her less worthy of belief. Insofar as the courts in *Chew, Winfield,* and *Joyce* move in this direction, they read *Davis* too broadly. But drawing a bright line between those cases in which the defendant plausibly suggests that the victim's sexual history does and cases where it does not give rise to a motive to fabricate is no easy task. In the end, it is simply a matter that requires a trial judge to exercise prudent judgment.

Applying this principle to the case at bar presents a difficult question. On the one hand, to suggest that a woman who is shown to have been sexually active would become so angry that she would invent a rape charge may be more than a bit old-fashioned. But on the other, it is the former pervasiveness of this traditionalist view that ultimately led the Congress and forty-eight state legislatures to

enact rape shield legislation, protecting rape victims from having to endure trials in which they are cross-examined about their entire sexual past. It is paradoxically *because* being confronted with one's sexual activity—or at least with its more lurid aspects—is thought to be the source of extreme embarrassment that Stephens has a right to present this evidence. Thus, I ultimately conclude that Stephens' claim—that what he told Wilburn so enraged her that it led her to accuse him of rape—is some evidence of a motive to fabricate. As such, the Constitution requires that he be permitted to introduce this evidence at trial. Thus, unlike the overwhelming majority of applications of rape shield laws—applications that pose no serious constitutional difficulty—Indiana's rape shield law here served to deprive Stephens of his constitutional right to present a defense.

## II.

The majority, having found no constitutional violation, had no occasion to address the possible question of harmless error. Because I find that Stephens' constitutional rights were violated, I next examine whether this violation may be treated as a harmless error.

While the district court found no constitutional error, it had no hesitation in concluding that, had there been error, it would have been harmless. According to the district court, Stephens' version of the story is "inconceivable" because only fifteen minutes elapsed between the time Stephens arrived at Wilburn's house and the time he arrived at the Straits' house, following the incident. Thus, "the jury would have been hard pressed to believe this whirlwind courtship took place in a matter of fifteen minutes." *Stephens v. Morris*, 756 F.Supp. at 1143. Because the court was "persuaded that no reasonable jury would have found the proffered testimony would have raised a doubt as to the petitioner's guilt," depriving him of his constitutional right to offer that testimony was a harmless error. *Id.*

This is a common approach to harmless error analysis. Where an error is not harmless, the necessary remedy is a new trial.

However, many appellate judges (as well as trial judges reviewing state convictions in habeas cases) apparently believe that, where "there is no legally sufficient evidentiary basis for a reasonable jury" to acquit the defendant, there is no point in ordering a new trial. Instead, they essentially enter summary judgment for the prosecution, declaring any constitutional error to be harmless. *See* Fed.R.Civ.P. 56(a)(1).

The only problem with this procedure is that it is patently unconstitutional. All criminal defendants—even the most guilty of them—have a constitutional right to have a jury, not an appellate judge, find them guilty beyond a reasonable doubt. While I do not believe this proposition ever to have been in serious doubt, the Supreme Court, speaking through Justice Scalia, made the matter abundantly clear last Term. The harmless error question asks:

> [N]ot what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which the "jury *actually rested* its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

*Sullivan v. Louisiana*, —— U.S. ——, —— - ——, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993) (citations omitted) (emphasis in original).

This principle helps explain the distinction that the Court drew, in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), between "trial errors", which may be treated as harmless, and "structural errors" which may not. While most constitutional errors may be treated as harmless, there are some rights that "are so

basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). Where the error so infects the trial that it would be impossible to determine that the error did not affect the jury verdict, harmless error analysis is infeasible, and a rule of *per se* reversal applies. *See* Charles J. Ogletree, Jr., Arizona v. Fulminante: *The Harm of Applying Harmless Error to Coerced Confessions,* 105 Harv.L.Rev. 152, 162 (1991) ("a trial error seems to be one for which we can sometimes know for sure whether it has caused inaccuracy in a trial outcome, and a structural error seems to be one for which we can never know with any certainty").

Most constitutional errors involve the wrongful admission of evidence that ought to be excluded. All such errors are "trial errors," and harmless error analysis is unproblematic. The *Fulminante* Court therefore concluded that in "reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265.[3]

Unlike "trial errors," which may be treated as harmless, "structural errors" require *per se* reversal. It is perhaps arguable that the error here—interference with a defendant's right to present evidence—is a structural error. For example, the Supreme Court noted in *Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (emphasis added), that harmless error analysis "presupposes a trial, at which the defendant, represented by counsel, *may present evidence* and argument before an impartial judge and jury."

But this may overstate the case, as the Court held in *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), that a denial of a defendant's right to cross-examine adverse witnesses (which is closely analogous to the right to present evidence) may be treated as harmless. But the mechanics of the analysis are instructive here. In *Van Arsdall,* the Court addressed the argument that all errors involving the erroneous exclusion of evidence require *per se* reversal. "Because it is impossible to know how wrongfully excluded evidence would have affected the jury, the argument runs, reversal is mandated." *Id.* at 683, 106 S.Ct. at 1437.

The Court rejected this contention. While Confrontation Clause errors are amenable to harmless-error analysis, the "correct inquiry is whether, *assuming that the damaging potential of the cross-examination were fully realized,* a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* at 684, 106 S.Ct. at 1438 (emphasis added).

Fairly read, *Van Arsdall* requires that, where a trial court deprives a defendant of his constitutional right to attack the credibility of a prosecution witness, a reviewing court engaging in harmless error analysis must assume that the defendant would have fully impeached the witness' credibility. In effect, the reviewing court should assume that the impeachment would have been so devastating that the error, in effect, was in *admitting* the testimony of the prosecution witness in the first instance. The court should then engage in the conventional harmless error analysis, setting aside the evidence that was "erroneously admitted," and deciding the effect that this error had on the verdict. If the court is convinced that the verdict did not rely on the testimony of the prosecution witness, the error may be treated as harmless and the conviction affirmed. *Cf. Sandoval,* 996 F.2d at 149–50 (limiting defendant's ability to impeach victim's statements rendered harmless

---

**3.** The Court's decision in *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), abolished the use of the "harmless beyond a reasonable doubt" standard on habeas review. Instead, the Court found that on collateral review a court is to treat an error as harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* —— U.S. at ——, 113 S.Ct. at 1718, quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). But *Brecht* affects only the standard of review, not the mechanics of the analysis.

by trial judge's instructing the jury to disregard the statement).

In this case, Stephens sought to introduce testimony suggesting that Wilburn was fabricating the rape charge. Depriving Stephens of his opportunity to testify to this effect was constitutional error. This error was harmless only if the court can say that Wilburn's testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." Because Wilburn was the key prosecution witness, we obviously cannot make such an assertion.

Because Stephens was denied his constitutional right to testify on his own behalf, and because we cannot conclude that the error was harmless, the district court's denial of habeas corpus relief should be reversed. Stephens is entitled to a new trial, one in which he is permitted to tell his story to the jury. If the story is as implausible as the district court believes, Stephens will again be convicted in short order. But because Stephens' first trial was constitutionally deficient, I respectfully dissent.

COFFEY, Circuit Judge, dissenting.

The worthy purpose of the Indiana Rape Shield Statute, Ind.Code §§ 35-37-4-4, as I understand it, is to protect rape victims from having their sexual history paraded in front of the jury and to keep the focus of rape trials on the particular crime in question. This habeas appeal calls upon the court to weigh the scales of justice and strike a balance between the criminal defendant's Fourteenth Amendment right to due process with the State of Indiana's interest in protecting rape victims from embarrassment during trial. It is unquestioned that a criminal defendant has a right to testify on his or her own behalf. *United States v. Dunnigan,* ── U.S. ──, ──, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993); *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987). This right is derived from the Due Process Clause of the Fourteenth Amendment, *Rock,* 483 U.S. at 51, 107 S.Ct. at 2708 ("[t]he right to testify on one's own behalf at a criminal trial ... is one of the rights that 'are essential to due process of law in a fair adversary process'") (quoting *Faretta v. Cal-*

*ifornia,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975)), as well as the Sixth Amendment guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process in obtaining witnesses in his favor."

As the other opinions make clear, the issue is whether application of the Indiana rape shield statute barred Stephens from exercising his constitutional right to testify. The other opinions deal with this question as an all or nothing proposition. I am of the opinion that in order to respect both the criminal defendant's constitutional right to present his defense and the State's interest in preventing the disclosure of rape victim's sexual history, a middle road is the course we must pursue. *See Cunningham v. Peters,* 941 F.2d 535, 538 (7th Cir.1991) ("[t]his case presents a conflict between the rights of criminal defendants under the sixth and fourteenth amendments to present evidence in their own defense and the state's 'sovereign prerogative' to regulate the presentation of evidence in its courts") (quoting *Johnson v. Chrans,* 844 F.2d 482, 484 (7th Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 95, 102 L.Ed.2d 71 (1988)), *cert. denied,* ── U.S. ──, 112 S.Ct. 1484, 117 L.Ed.2d 626 (1992). The majority dismisses the defendant's appeal to the doctrine of *res gestae,* because allowing a *res gestae* exception to rape shield legislation "would effectively gut rape shield statutes," majority at 1003, and because "no court has ever held that *res gestae* is a concept with any constitutional significance." *Id.* at 1003. I believe we must give the defendant his day in court and thoroughly analyze his defense before dismissing his argument. Although the term *res gestae* may be obsolete, the principle inherent in the term maintains its vitality. The defendant in this action is merely asking this court that he be granted the opportunity to present his version of the incident in his own words within the limitations of the statute and the Constitution. Essential to his version of the event is the very statement he made contemporaneous with the said act of sexual intercourse that, according to him, prompted the victim to instantly terminate the alleged consensual relationship. A mere paraphrase of his proffered testimony (that

he said "something" that caused her to "[tell him] to stop") falls far short of conveying the true impact of the actual repulsive language he allegedly uttered. Regardless of *res gestae,* denying Stephens the opportunity for his day in court would offend due process. *Rock,* 483 U.S. at 51, 107 S.Ct. at 2708; *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). Moreover, I disagree with the majority's observation that allowing a narrow exception to the rape shield statute for the defendant to present testimony central and vital to his defense would undermine rape shield legislation. It would do nothing of the sort. Indeed, fundamental fairness mandates that the defendant be entitled to present evidence that is central to the defense and inextricably intertwined with the alleged criminal behavior. *Id.* Since the testimony falls short of recounting the victim's past sexual conduct or reputation, I have some doubt that it even contravenes the very intent of the rape shield statute. Thus, while rape shield legislation has been adjudged constitutional, *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), in this instance, a minor exception to the State's interests in protecting rape victims must be made to accommodate the defendant's constitutional right to present the heart of his defense. Such a narrow exception would be comparable to the exceptions admitting otherwise inadmissible evidence under the Federal Rules of Evidence.

The testimony the defendant seeks to introduce does not go toward discrediting the victim, rather, it goes to the heart of his defense (according to Stephens)—he and the complainant were engaged in consensual sex until his degrading comments triggered her abrupt attitudinal or motivational change causing her not only to terminate the alleged consensual sexual encounter but prompted her to subsequently allege rape. Thus, I would hold that the defendant's constitutional right to testify entitled him to relate to the jury that while allegedly engaged in consensual sex in an animal-type manner, he stated to the complainant something to the effect that he thought she liked to do it "doggie fashion." Admission of this testimony, without mentioning the victim's prior partners, accommodates the defendant's constitutional right to testify and neither flies in the face of nor contravenes the very intent of the rape shield statute which bars evidence of the victim's past sexual conduct. I understand that admission of this small portion of his testimony could very well be argued to create an exception to the rape shield statute. So be it, for the exception, comparable to exceptions under the rules of evidence, is mandated by the Sixth and Fourteenth Amendments which create and protect the constitutional right to testify. Furthermore, to insure this protection, the trial court might give a limiting instruction to the jury directing that the testimony be considered only as to the question of whether Stephens' statement to the victim may have triggered her abrupt attitudinal change and not for assessing her credibility based on her prior sexual conduct. After admission of the testimony, the jury would then be called upon to weigh the question of Stephens' credibility and determine whether in fact he even uttered the statement and whether in the eyes of the trier of fact it was regarded by the victim to be so degrading that it motivated her to abruptly change her attitude toward Stephens. It is the finder of fact, with all the evidence before it, who "has the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subjects' reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,'" and not an appellate court which has nothing before it but the cold pages of the court transcript. *United States v. Tolson,* 988 F.2d 1494 (7th Cir.1993) (quoting *Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992)).

Stephens' remaining statements present a less compelling constitutional claim and were properly excluded by the trial court because

> "the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [*Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973).] But restrictions of a defendant's right to testify may not be

---

arbitrary or disproportionate to the purposes they are designed to serve. In applying its evidentiary rules, a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." *Rock*, 483 U.S. at 55–56, 107 S.Ct. at 2711 (footnote omitted). Stephens' offer of proof also included the statement that "Tim Hall said you [liked it this way]" and the statement that the victim had swapped partners. Since these statements fly directly in the face of the rape shield statute in that they are explicit references to the victim's reputation and prior sexual conduct, the State's interest in excluding the evidence is greater because the potential embarrassment to the victim is greater. Although exclusion of the testimony will impinge somewhat on the defendant's right to testify, "the right to present relevant testimony is not without limitation," *id.*, and in this instance, the exclusion of the testimony is neither "arbitrary" nor "disproportionate to the purposes [the exclusion is] designed to serve." *Id.* Accordingly, the testimony naming prior partners and partner swapping was properly deemed inadmissible.

The question remains whether exclusion of the "doggie fashion" comment was harmless error. For appellate judges to speculate what a jury would have done had it heard certain testimony is like stepping into quicksand. *See Sullivan v. Louisiana,* —— U.S. ——, —— — ——, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993) ("[T]o hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the finding to support that verdict might be—would violate the jury-trial guarantee.... The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action...."). In the case before us, the jury was not allowed to hear the statement that allegedly caused the victim to claim rape, rather the defendant was only permitted to tell the jury that he said "something" that angered the victim. Such a watered down version of his story certainly lacked the impact of the gutter-type words that might conceivably have triggered the victim's alleged explosive attitudinal change. In a case where the testimony of the two individuals was so diametrically opposed, limiting the

defendant to a bland paraphrase effectively undermines his constitutional right to testify. In this instance, the Constitution mandates a minor exception to the rape shield statute to allow the defendant to have his day in court to present the very key words to his defense. *Rock*, 483 U.S. at 51, 107 S.Ct. at 2708. Exclusion of his testimony was not harmless, thus, a remand for a new trial is necessary. I respectfully

DISSENT.

RIPPLE, Circuit Judge, dissenting.

Today's decision will no doubt be hailed as a very "contemporary" one. However, the correctness of a ruling by Judges of the Third Article is not measured by whether it is "contemporary" but by whether it protects the basic constitutional values that undergird our political and legal order. When viewed from this perspective, the court's decision represents a radical departure from the standards established by the Supreme Court of the United States for the protection of the right of an accused to give evidence in his or her own defense. It also condones an injustice that raises the distinct possibility that an innocent person has been convicted of a most heinous crime. I shall discuss each of these considerations briefly.

1.

As the Supreme Court has reminded us on many occasions, the basic function of the criminal trial is to find, even in the most complex and delicate of human situations, THE TRUTH. At this stage in the development of our constitutional law of criminal procedure, there can be no question that a person accused of a criminal offense has the fundamental right to tell his or her story to the trier of fact. *See Rock v. Arkansas,* 483 U.S. 44, 49, 107 S.Ct. 2704, 2707, 97 L.Ed.2d 37 (1987) (stating that "it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense"); *Ferguson v. Georgia,* 365 U.S. 570, 573–82, 81 S.Ct. 756, 758–63, 5 L.Ed.2d 783 (1961) (detailing the evolution of the right to testify in one's own behalf). Indeed, the Supreme Court of the

United States has long recognized that this right is among those "essential to due process of law in a fair adversary process." *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975); *see also In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948) (stating that a "person's right to ... an opportunity to be heard in his defense—a right to his day in court—[is] basic in our system of jurisprudence"). In similar fashion, the Compulsory Process Clause of the Sixth Amendment, made applicable to the states by the Fourteenth Amendment, includes the right of the defendant to take the stand in his or her own behalf. *Rock,* 483 U.S. at 52, 107 S.Ct. at 2709. Indeed, the Supreme Court has said that "[t]here is no justification for a rule that denies an accused the opportunity to offer his own testimony." *Id.* This right specifically includes "an accused's right to present his own version of the events in his own words." *Id.* Finally, the right of the accused to tell his or her own story in his or her own words is rooted in the Fifth Amendment right to decide whether or not to testify. As the Supreme Court has put it, that guarantee includes the right of the accused to remain silent unless he or she chooses to speak "in the unfettered exercise of his own will." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

To be sure, the right to present evidence on one's own behalf is not absolute and may be limited in order to protect an important countervailing governmental interest. For instance, in *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the Court determined that a state could enforce a state procedural requirement that a defendant provide notice that the defendant planned to introduce evidence of prior sexual conduct by preclusion of the proffered testimony.[1] Nevertheless, although the right of an accused person to present evidence in his or her own defense is not absolute, the cases

have demonstrated a consistent mistrust of such restrictions. They have required that the state demonstrate that there is an important interest to be served by such an exclusion. The more critical the excluded evidence to the defense of the accused, the more important must be the asserted state interest. *See Chambers v. Mississippi,* 410 U.S. 284, 293–303, 93 S.Ct. 1038, 1044–49, 35 L.Ed.2d 297 (1973).

Given the Supreme Court's clear affirmation in *Rock* of the right of the accused to tell his or her story to the trier of fact, it is perhaps no accident that the cases of the Supreme Court upon which the State relies have dealt not with the testimony of the defendant. Here, we deal not only with the testimony of the defendant but the testimony of the defendant with respect to the actual criminal act of which he stands accused. The cases deal not with the right of the accused person to present an account of the underlying event from his or her own lips but with the right of the accused to cross-examine witnesses. Even in that latter context, however, the Supreme Court's cases recognize the importance of this guarantee in the proper working of the adversary process. The Court requires that the state court weigh the necessity of a preclusion sanction against the values protected by the Sixth Amendment.[2] Important to the Court's inquiry has been the centrality of the proffered testimony. Attempts to show "prototypical form of bias on the part of the witness," *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), have always been considered especially important to the preservation of that right. For instance, in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), a case that bears, as Judge Cudahy notes, a striking similarity to our own, the Supreme Court held that the defendant had the right to cross-examine a witness for the prosecution by showing that the witness, on probation at the time, was

---

1. In similar fashion, the Supreme Court has held that enhancing the defendant's sentence because of perjurious testimony is not an impermissible bar on the right to testify in one's own behalf. *United States v. Dunigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993) (col-

lecting cases that hold that the right to testify does not include the right to commit perjury).

2. It is also important to note that the preclusion order in the case before us was not aimed at the testimony of the defendant himself.

biased because of his desire to avoid further trouble with authorities. Although state law protected the anonymity of juvenile offenders, the Court held that the need to demonstrate such possible bias outweighed any privacy needs of the witness. In underlining the importance of showing such bias, the Court relied in part on its previous holding in *Greene v. McElroy*, which stated:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is *even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers of persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.* We have formalized these protections in the requirements of confrontation and cross-examination.

360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) (emphasis added).

The cases of the Supreme Court have also made crystal clear that, in assessing the importance of the testimony, it is of utmost importance to be sensitive to the realities of human life and the actions and reactions of real people. For instance, in *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), the Supreme Court summarily reversed an exclusion by the courts of Kentucky of evidence that the complainant in a sexual misconduct trial was living with the prosecution's key corroborative witness at the time of trial. The Court noted that the defendant's desire to demonstrate that the complainant had a motive to lie in order to protect her current relationship was an attempt to demonstrate a " 'prototypical form of bias.' " *Id.* at 231, 109 S.Ct. at 483 (quoting *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436). The possibility that the jury might be prejudiced by the victim's interracial relationship was not, held the Court, sufficient to

justify denying the defendant the opportunity to demonstrate that the complainant's interest in protecting the current relationship had resulted in her bias. *Id.* 488 U.S. at 232, 109 S.Ct. at 483.

2.

Jury service in this case must have been a very difficult task. The record reveals that the jurors were asked to resolve sharply contested versions of what occurred in the complainant's trailer on the night of March 17, 1987.

The complainant was able to relate fully to the jury her account. She was asleep on the couch when the defendant arrived. Her sister and brother-in-law were asleep in the guest room off the kitchen. Her son and her nephew were asleep in a bedroom off the hallway which also was located near the bathroom. When the complainant awoke, the defendant was standing in the front door inside the trailer. He sat down beside her and made sexual suggestions and attempted to kiss her. She told him of the presence of others in the trailer and called out for her sister. He ceased his advances for the moment, but then began holding her and attempted once again to kiss her. She called out once again for her sister who still did not respond. The defendant said he would go but first needed to use the bathroom. He walked down the hall and then returned to the complainant and angrily told her that she had lied about the presence of others in the trailer. He then threw her down on the couch, pressed his hand across her mouth to suppress a scream she was about to utter. He pressed his body against hers, undid her bra, and tore a button from her shirt. As he reached to undo his trousers, the victim flipped him off her and ran into the bedroom off the kitchen while shouting for her sister and brother-in-law.

The defendant's version of the facts is quite different. Some of it was heard by the jury; some was not. According to him, he arrived at the defendant's trailer around 10:00 p.m. pursuant to a standing invitation to visit sometime. He testified that, when he arrived, the complainant was awake and, after a brief conversation, invited him into the

trailer. He further testified that, at the complainant's suggestion, he carried her child to her bedroom and then rejoined the complainant on the couch. After a few moments of small talk about her pending divorce, the defendant asked the complainant if he could give her a kiss. While kissing her he fondled her breast and unhooked her bra. Because the complainant could not lie down comfortably on the couch, she suggested that they lie down on the floor. Together, they moved the coffee table and placed it against a chair opposite the couch. The defendant began to remove his clothes and then assisted the complainant in the removal of hers.

Up to this point, the defendant, like the complainant, had been allowed to tell his story to the jury. But now, at the crucial point of whether the sexual intercourse was consensual, the defendant was prohibited from telling the jury his version of what transpired. He had wanted to tell the jury that, while he and the complainant were engaging in consensual sexual intercourse, he said to her that another couple had told him that they had been involved in a sexual partner switching arrangement in which she had also participated and that she liked to engage in sexual intercourse "doggy fashion." The defendant wished to testify that *this remark of his* so angered the complainant that she made him stop and told him to leave. As he left, he heard her call for her sister. The jury, however, never heard what the defendant claims he said that elicited such a strong reaction from the complaining witness. Instead, the trial court restricted him to saying that he had said "something" that made her angry.

As is often the case in these situations, some of the evidence from sources other than the participants supports the complaining witness' version and some supports the defendant's version. The defendant arrived at the home of friends around 10:15 p.m. He did not reveal that he had been to the complainant's home, but told them that he had been left at McHughes' Pic a Pac by his friend Stone. He testified that he told them this story because he did not want them to know that he had been to the complainant's trailer and had engaged in sexual intercourse

with her. He left at about 11:10 p.m. At about 12:30, the complainant's former husband arrived at the defendant's trailer and accused the defendant of attempting to have sexual intercourse with "his old lady." The defendant denied the charge. The defendant also admitted that he had told his girlfriend four different versions of the event and explained his untruths on the ground that, had she known that he had had sexual intercourse with the complainant, she might have left him and taken the children. It is also clear that Stone, the friend who drove the defendant to the complainant's house, initially lied at the defendant's behest.

If, on balance, the post-incident activities of the defendant do not enhance his story (although it is difficult to estimate the weight a jury might give such matters), some, although not all, of the post-incident activities of the complainant certainly present matters that make her version of the incident susceptible to adverse interpretation. After waking her sister and brother-in-law, the complainant appeared visibly upset. Her brother-in-law said he saw a man in a red shirt running in a southeasterly direction. The complainant told her sister what had happened and asked her if there were marks on her face. The sister observed marks on the entire face as if someone had placed a hand over her mouth. At about 11:30 p.m., the complainant received a call from her estranged husband, who was supposed to have visited that night and called to say that he would be late. The complainant told her husband that the defendant had tried to rape her. The husband, after stopping at Stephen's residence, came to the trailer at about 1:00 or 1:30 a.m. The husband was in an agitated state; his noise awoke the complainant's sister and brother-in-law and a verbal and physical altercation ensued between the two men. The complainant's sister called the police. When the police responded to the call, neither the complainant nor anyone else informed the officers of the alleged attempted rape. Indeed, no report was made of the attempted rape to the authorities until, on the following evening, the complainant was confronted by her landlady who complained about the noise in the trailer during the altercation between the complainant's husband and brother-in-law.

The landlady told the complainant that she would tolerate no problems in the trailer park. The complainant told the landlady that the police had been called because an intruder had been in her trailer and "that's what the fight was over." Tr. 573. She did not mention an attempted rape. The landlady suggested that the complainant go to the police and seek a restraining order. The complainant, in the company of her brother-in-law, then went to the police station and reported the incident with the defendant the night before as an attempted rape.

As in *Olden*, these facts required the jury to make a careful judgment on a delicate human situation in which the perspectives, motivations, and emotions of the various actors were, as they often are in such a case, complex and subtle. Ascertaining THE TRUTH to a degree of certainty that would justify the imposition of criminal liability and a twenty year sentence was an awesome responsibility.

As a practical matter, if the defendant was to be exonerated with respect to this accusation, he had to convince the jury that his encounter with the complainant was, from start to finish, consensual. He therefore had to ask the jury to make a crucial assessment of his credibility as opposed to that of the complainant. This task required the members of the jury to assess his personality as well as hers and to assess the cultural environment in which the two lived and interacted with others. What might have seemed a very implausible story if told by others from a different cultural environment may have been very plausible when told by the defendant. Whether the complainant consented to have sexual intercourse with the defendant and whether the statement that was allegedly made to her would have caused her to withdraw that consent and become so infuriated as to recharacterize the encounter when it suited her convenience is an issue upon which the cold record reveals little. Ascertaining THE TRUTH required a careful assessment of personalities, demeanor, and temperament of the two individuals. To limit the defendant to testifying that he said "something" that angered her is to deprive the jury of the essence of his testimony. It

was the rawness of what he allegedly said that would have given substance to his testimony. Only after being apprised of that statement and ascertaining whether such an utterance, made when it was made, would produce the reaction it did in this particular complainant could the jury have determined whether the statement was made and, if made, whether it produced the alleged reaction.

It is doubtful that many trial attorneys experienced in criminal matters, whether as prosecutors or as defense counsel, will be able to read the majority opinion and maintain any reasonable intellectual comfort level that THE TRUTH was indeed ascertained. The reason for this unease is quite apparent. The defendant was forbidden from presenting to the jury evidence that was central to his defense—a description of the event in question. If that description had been accepted by the jury, he would have been free of all criminal responsibility. As Judge Cummings points out, the majority carefully steers clear of assessing just how central this testimony was to the defendant's defense. The majority also fails to deal adequately with the reality that the proffered testimony would not have been admitted for its truth, but simply to show that there was a serious reason for the victim to have been enraged and to have reacted as the defendant submits that she did react. Indeed, simply to tell a jury that the victim became angered by an undisclosed statement of the defendant, while forbidding the defendant an opportunity to disclose the statement that triggered such a violent reaction under the circumstances, is not only to prevent the defendant from telling his side of the encounter, but to cast him as evasive—a damning characterization under the circumstances presented here. The trial court's decision not only deprived the defendant of the ability to give, from his own mouth, his own version of the event, but the bland substitution also portrayed him to the jury as someone less than frank. A juror, realizing the importance of the testimony to the defendant's case, certainly would expect that he be quite a bit more specific than "I said something to make her angry." The trial court not only denied him the right to tell the jury his own story, it also rewrote the

script in a fashion that portrayed him as someone unworthy of belief because of the vagueness of his reply.

Few cases within our habeas jurisdiction raise serious issues as to the guilt or innocence of the defendant. Here, however, we do not deal with a technical nicety of criminal procedure. We are confronted with the reality that THE TRUTH might have been hidden from the jury. This case thus leaves us with the haunting fear that, had the jury been allowed to hear both sides of the story and evaluate the demeanor of both witnesses as they told what happened, the result may well have been different. The responsibility for this result must rest on other shoulders.[3] I would reverse the judgment of the district court. The state must permit the defendant to tell his side of the story before it deprives him of 20 years of his life.

---

**3.** Indeed, the majority makes it clear that *it* disbelieves the defendant's story. It is, however, the prerogative of the jury in the state proceeding to reach a conclusion on that issue, not a federal court on habeas appeal.