## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 27 2017, 11:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Mincey, Jr.,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

July 27, 2017

Court of Appeals Case No.
71A03-1611-CR-2720

Appeal from the St. Joseph
Superior Court

The Honorable Jeffrey L. Sanford,
Judge

Trial Court Cause No.
71D03-1503-F3-8

**Bradford, Judge.**

# Case Summary

[1]     In September of 2014, J.T. was living in Indianapolis and working as a home assistant aid for elderly persons. On September 14, 2014, J.T. took a bus to South Bend for the purpose of visiting family who lived in the area. Later that evening, J.T. decided to walk from her aunt's home to a nearby club called Amvets. While walking to the club, J.T. was approached by Appellant-Defendant James Mincey, Jr., who offered to give her a ride to the club. Mincey, however, did not take J.T. straight to the club. Instead he took her to his home, forced her inside, and battered and anally raped her. Mincey eventually dropped J.T. off at the club. J.T. hid in the bushes outside the club and notified police. After police arrived, J.T. identified Mincey as her assailant and led police to his home.

[2]     With respect to his actions involving J.T., Mincey was subsequently charged with and convicted of Level 3 felony rape and Class A misdemeanor battery resulting in bodily injury. On appeal, he challenges his rape conviction, arguing that (1) the trial court abused its discretion by improperly limiting his cross-examination of J.T. and (2) the deputy prosecutor committed prosecutorial misconduct during his closing argument. We affirm.

# Facts and Procedural History

[3]     J.T. is a mother and grandmother. In September of 2014, J.T. was living in Indianapolis and working as a home assistant aid for elderly persons. On

September 14, 2014, J.T. took a bus from Indianapolis to South Bend so that she could visit family members who lived there. J.T. arrived in South Bend during the mid- to late-afternoon. Upon arriving, J.T. called her cousin and got a ride to her aunt's house. Over the next few hours, J.T. spent time with family at her aunt's house. J.T. subsequently indicated that "[w]e sat around. We laughed, talked like we always do. We ate and had a few beers. Well, of course, everybody was all together." Tr. Vol. II, p. 59.

[4] Later that evening, J.T. decided to walk to a nearby dance club and bar called Amvets. J.T. indicated that she would normally go to Amvets during her visits to South Bend because "that's the only place I know I can go and see all my old friends and family members be there, you know. And [on past visits] I've ran [sic] into people I haven't seen in years." Tr. Vol. II, p. 57.

[5] While J.T. was walking to Amvets, Mincey approached her in a "grayish SUV," asked where she was going, and offered her a ride. Tr. Vol. II, p. 62. J.T. accepted the ride. While en route to Amvets, J.T. and Mincey stopped at a service station where Mincey bought cigarettes and a cup of ice. Upon leaving the service station, however, Mincey did not take J.T. to Amvets. Instead, Mincey "turned off down a real dark like alley where there's like trees everywhere." Tr. Vol. II, p. 65. J.T. indicated that

> [Mincey] was going really, really fast, and I was like, well, you know the Amvets is the other way. And he was saying he had to stop somewhere, you know. And then I was like – that's when I kinda got feeling nervous because you can't see on either side of you. You know, it's just a lot of trees, a lot of trees all the way

down. And he just kept going. And I was saying what I was saying. He was focusing on -- you know, he was just doing what he -- you know, he wouldn't listen to me. He just kept going.

Tr. Vol. II, pp. 65-66. Mincey would not look at J.T., but kept driving until he came to a stop behind a white house.

[6] Once the vehicle stopped, Mincey told J.T. to "get out, we're going in." Tr. Vol. II, p. 67. J.T. "wasn't going to go in" because she "didn't feel comfortable" doing so. Tr. Vol. II, p. 67. However, the next thing she knew Mincey punched her in the head and after which she "was seeing stars." Tr. Vol. II, p. 67. Mincey then "forced [J.T.] into the house." Tr. Vol. II, p. 69. After forcing J.T. into the house, Mincey "made [her] take [her] clothes off." Tr. Vol. II, p. 69. J.T. indicated that after Mincey ordered her to remove her clothing,

> I was standing there and I was looking at him. And I was fidgeting around kind of like, but he just started hitting me all up side my head and, you know, in my jaw. And like I said, it wasn't love taps. I mean he was -- I mean I was just seeing stars, and I just started taking the stuff off. You know, I didn't know what to do.

Tr. Vol. II, p. 70. J.T. was "terrified" but did as Mincey ordered. Tr. Vol. II, p. 71.

[7] After J.T. removed her clothing, Mincey "forced [J.T.] over this couch" by using his elbows to force her "neck down" and continuing to hit her. Tr. Vol. II, p. 71. Mincey then "started having anal sex with" her. Tr. Vol. II, p. 71.

J.T. was fighting him even though "every time [she] would twist or move, he would hit [her]." Tr. Vol. II, p. 71. J.T. indicated that there were "no words" for the amount of pain that she felt when Mincey penetrated her anus. Tr. Vol. II, p. 72.

[8] At some point, J.T. realized that Mincey was going to really hurt her if she kept resisting because the more she resisted, "the more force he put down on [her] head and the more he would hit [her] in the side of [her] head." Tr. Vol. II, p. 72. J.T. realized that she "didn't have no win" because Mincey was a big, strong guy. Tr. Vol. II, p. 72. J.T. indicated that the attack "wasn't nothing nice" and seemed to have "lasted hours." Tr. Vol. II, p. 72. J.T. further indicated that Mincey "didn't care … [h]e wanted what he wanted, and he took it." Tr. Vol. II, p. 72. J.T. eventually quite resisting and "just prayed to God" because "[t]hat's all [she] could do." Tr. Vol. II, p. 73.

[9] Mincey stopped his attack when J.T. indicated that she needed to use the bathroom. J.T. had hoped that there would be a window in the bathroom through which she could escape. This was not the case, however. Mincey stood in the open bathroom door watching J.T. After J.T. attempted to use the bathroom, Mincey "forced [her] back over the couch" and continued to forcibly anally penetrate her. Tr. Vol. II, p. 78. J.T. subsequently described Mincey's actions as being "painful." Tr. Vol. II, p. 80. Mincey "jumped up" and stopped the attack when J.T. "set [ ] off" a can of roach spray which she found on the floor. Tr. Vol. II, p. 81. Mincey ordered J.T. to put her clothes on before leading her out of the house, putting her in his vehicle, and taking her to

Amvets. Mincey dropped J.T. off at Amvets. Upon discovering that Amvets had closed for the evening, J.T. "hid in the bushes and called the police." Tr. Vol. II, p. 82.

[10] When South Bend Police Officer Andrew Jackson arrived at the scene, J.T. was "very upset." Tr. Vol. II, p. 38. She was crying and "was frantically waving her arms to try to get [the officer's] attention." Tr. Vol. II, p. 38. Officer Jackson "could immediately tell that [J.T.] needed help." Tr. Vol. II, p. 38. Officer Jackson unsuccessfully attempted to identify the location of the attack before taking J.T. to the hospital. Once at the hospital, J.T. was found to having bruising and swelling on the side of her face. J.T. complained of "having a large amount of rectal tenderness" and was found to have an "anal fissure which is a tear in the skin" near the rectum. Tr. Vol. II, pp. 170, 177. J.T. also suffered from "recent incontinence of stool" which occurs "when the muscles around the rectum can't hold stool in and stool sips out from the rectal area." Tr. Vol. II, pp. 191, 190. Both the anal fissure and incontinence of stool can be signs of anal rape. J.T. later identified Mincey as her attacker and led police to the location of the attack.

[11] On March 9, 2015, Appellee-Plaintiff the State of Indiana ("the State") charged Mincey with Counts I through III – Level 3 felony rape, Count IV – Level 5 felony criminal confinement, Counts V and VI – Level 3 felony rape, and Count VII – Class A misdemeanor battery resulting in bodily injury. Because the charges related to two separate victims, on March 24, 2016, the trial court severed Counts I through IV from Counts V through VII. A jury trial

commenced on Counts V through VII on August 15, 2016. Following the conclusion of trial, the jury found Mincey guilty of Counts VI and VII, but not guilty of Count V.[1] Mincey subsequently pled guilty to Count I. In exchange for Mincey's guilty plea, the State agreed to dismiss Counts II through IV. On November 1, 2016, the trial court imposed an aggregate twelve-year sentence. This appeal follows.

# Discussion and Decision

## I. Exclusion of Evidence

[12] Mincey contends that the trial court abused its discretion by excluding evidence relating to J.T.'s prior 2004 prostitution conviction. On appeal, "[w]e afford broad discretion to a trial court's decisions on whether to admit or exclude evidence, and review such decisions for abuse of discretion." *Conrad v. State*, 938 N.E.2d 852, 855 (Ind. Ct. App. 2010). "An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the facts and circumstances before it." *Id.* (citing *Oatts v. State*, 899 N.E.2d 714, 719 (Ind. Ct. App. 2009)).

[13] Mincey argues that the trial court abused its discretion by ruling that he could not ask J.T. about her 2004 prostitution conviction during cross examination. We observe that despite the trial court's ruling that Mincey could not cross-

---

[1] Count V alleged that Mincey vaginally raped J.T.

examine J.T. by questioning her about her prior prostitution conviction, the trial court did allow Mincey to question J.T. extensively about whether she was engaged in prostitution on the night in question. During cross examination, the following exchanges took place between defense counsel and J.T.:

> Q     Okay. And you saw Mr. Mincey driving by; isn't that right?
> A     I saw him when he asked me did I want a ride, yes.
> Q     Okay. You in fact waved him over, didn't you?
> A     No, I didn't.
> Q     You didn't go up to his window and stick your head in and start talking with him?
> A     No, I didn't.
> Q     And you didn't engage in some little banter with him about wanting to party?
> A     Not at all.
> Q     Not at all. Okay. Yet after he pulls over you get into the car with him. Right?
> A     Yes.

Tr. Vol. II, pp. 119-20.

> Q     All right. And when you got to the house, you willingly went into the house; isn't that right?
> A     No.
> Q     And you willingly took your clothes off, didn't you?
> A     No, I didn't.
> Q     In fact Mr. Mincey had asked you to perform sex for money; isn't that right?
> A     No, it's not.
> Q     Okay. So you're saying you didn't offer to have sex with him for money that evening?
> A     No.
> Q     Is that something you'd never do?

A        Have sex for money?  No.

Q        You'd never do that?

A        Have sex for money?  No.  I didn't have a reason to have sex for money.

Q        Okay.  Is that something you would never do?

A        No, I'm not going to have sex for money.  No.

Q        Okay.

A        This date, no.

Tr. Vol. II, pp. 129-30.

At this point, defense counsel requested permission to approach the trial judge and the following side bar was held out of the hearing of the jury:

> [Defense Counsel]: At this time I would like to impeach her by way of a conviction for Prostitution.  At her deposition she lied and said she had no convictions for prostitution.  I did find that she does have one.  Number one, she lied about it in her deposition.  Number two, she opened the door by saying she would never have sex for money.
> [The Court]:        Go ahead, State.
> [The State]:        This is going square against rape shield.  He has put this into issue himself.  You can't open your own door here, and that's what he is trying to do.  At no point did we ask anything related to this.  This was all his questioning.
> [Defense Counsel]: Well, it is our defense that she offered to have sex with him for money.
> [The State]:        And in addition to that she said in this day and age, no.  I would not.  This conviction looks like it's around --
> [Defense Counsel]: 2004.
> [The State]:        Yeah.
> [The Court]:        I have to tell you that I am generally in agreement with the State in regard to this prior conviction.  But you tell me why you think it comes in.

[Defense Counsel]: It comes in because she has flat out denied that she would have sex for money and this is rebutting our defense. And she's also testifying that she would not have sex for money which we know is not true. And on top of that, she was specifically asked --

[The Court]: So you think it comes in because of why? To impeach her?

[Defense Counsel]: Well, to impeach her.

[The State]: Your Honor, that's akin to in a domestic battery trial me asking the defendant who is on the stand you would never hit a woman, would you? And then say, oh, I get to talk about 404(b) now. You don't get to open your own door. If she were to say it on her own, you know, I would never have sex for money, it might be different. But this --

[The Court]: Yeah, I think I'm going to sustain the objection. I'm not going to let you get into the prostitution conviction.

[Defense Counsel]: Okay.

Tr. Vol. II, pp. 130-31.

[15]    Defense counsel later revisited the subject of prostitution, engaging in the following exchange with J.T.:

Q    Okay. So you didn't agree to go back to Mr. Mincey's house and have sex with him in exchange for money?
A    No.
Q    And you weren't working as a prostitute that night?
A    No, I'm a home assistant aide, sir. I take care of elderly people. I had a paycheck. I work for my living.

Tr. Vol. II, p. 143. J.T. further admitted that she receives social security disability benefits due to the fact that she has been diagnosed as being both bipolar and schizophrenic. Following the conclusion of J.T.'s testimony, a

member of the jury submitted the following question: "Does J.T. have a history of prostitution?" Tr. Vol. II, p. 152. The trial court, however, did not ask J.T. this question.

[16] The trial court excluded the testimony regarding J.T.'s prior conviction for prostitution because evidence of a victim's past sexual conduct is not admissible except as provided in Indiana's Rape Shield Rule, Indiana Evidence Rule 412. *See Williams v. State*, 681 N.E.2d 195, 200 (Ind. 1997). Evidence Rule 412 provides, in relevant part, as follows:

> **(a) Prohibited Uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:
>> (1) evidence offered to prove that a victim or witness engaged in other sexual behavior; or
>> (2) evidence offered to prove a victim's or witness's sexual predisposition.
> **(b) Exceptions**.
>> (1) *Criminal Cases*. The court may admit the following evidence in a criminal case:
>>> (A) evidence of specific instances of a victim's or witness's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;
>>> (B) evidence of specific instances of a victim's or witness's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

> (C) evidence whose exclusion would violate the defendant's constitutional rights.
>
> ****
>
> **(c) Procedure to Determine Admissibility**.
>> (1) *Motion*. If a party intends to offer evidence under Rule 412(b), the party must:
>>> (A) file a motion that specifically describes the evidence and states the purpose for which it is to be offered;
>>> (B) do so at least ten (10) days before trial unless the court, for good cause, sets a different time;
>>> (C) serve the motion on all parties; and
>>> (D) notify the victim or, when appropriate, the victim's guardian or representative.
>>
>> (2) *Hearing*. Before admitting evidence under this rule, the court must conduct an *in camera* hearing and give the victim and parties a right to attend and be heard. Unless the court orders otherwise, the motion, related materials, and the record of the hearing is confidential and excluded from public access in accordance with Administrative Rule 9.

(Emphases in original).[2]

---

[2] The Indiana Supreme Court has held that Indiana's Rape Shield Statute does not violate a defendant's Sixth Amendment right to confront witnesses absent a showing of actual impingement on cross examination. *Thomas v. State*, 471 N.E.2d 677, 679 (Ind. 1984), *reh'g denied*. Thus, the trial court's exclusion of evidence must not prevent the defendant from conducting a full, adequate, and effective cross-examination. *See Lagenour v. State*, 268 Ind. 441, 444-45, 376 N.E.2d 475, 478 (1978).

*Oatts*, 899 N.E.2d at 722. The above-quoted language demonstrates that the trial court's exclusion of evidence relating to J.T.'s approximately ten-year-old prostitution conviction did not impinge Mincey's cross examination of J.T. as it did not prevent Mincey from conducting a full, adequate, and effective cross-

[17]     Our review of the record reveals that none of the exceptions set forth in Rule 412(b)(1) apply to the instant case. J.T.'s prior prostitution conviction dated back to 2004, and there is no indication or allegation that Mincey was in any way involved in J.T.'s prior sexual acts. Rather, the evidence offered here was of the classic sort precluded by the Rape Shield Rule: purported incidents with other men at other times offered simply to show that J.T. had consented in the past in the hope the inference will be drawn that she consented here.

> Rule 412 was enacted to prevent just this kind of generalized inquiry into the reputation or past sexual conduct of the victim in order to avoid embarrassing the victim and subjecting the victim to possible public denigration. *Stephens v. Miller*, 13 F.3d 998, 1002 (7th Cir. 1994), *cert. denied*, 513 U.S. 808, 115 S.Ct. 57, 130 L.Ed.2d 15. The Rule reflects a policy first embodied in Indiana's Rape Shield Act, Indiana Code § 35-37-4-4, that inquiry into a victim's prior sexual activity is sufficiently problematic that it should not be permitted to become a focus of the defense. Rule 412 is intended to prevent the victim from being put on trial, to protect the victim against surprise, harassment, and unnecessary invasion of privacy, and, importantly, to remove obstacles to reporting sex crimes. *See id*.

*Williams*, 681 N.E.2d at 200.

[18]     In *Williams*, the Indiana Supreme Court went on to state the following:

---

examination. Mincey was permitted to question J.T. at length about whether she was engaged in prostitution on the night in question. As such, the trial court's exclusion of the evidence relating to J.T.'s 2004 conviction for prostitution did not violate Mincey's Sixth Amendment right to confront witnesses.

Balanced against these considerations is the defendant's right to present relevant evidence. For this reason, Rule 412 permits evidence of the defendant's past experience with the victim, but does not permit a defendant to base his defense of consent on the victim's past sexual experiences with third persons. The allegation of prostitution does not affect this calculus. We agree with the Fourth Circuit's view that it is "intolerable to suggest that because the victim is a prostitute, she automatically is assumed to have consented with anyone at any time." *United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991), *cert. denied*, 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). Moreover, even when evidence does fall within one of Rule 412's exceptions and is admissible, it is still subject to Evidence Rules 401 and 403. In this case, the evidence would shift the jury's attention away from the defendants' actions to the past acts of the victim. Any probative value is "substantially outweighed by the danger of unfair prejudice." Evid. R. 403. Thus, the trial court properly excluded the evidence.

*Id*. at 200-01. We find the *Williams* Court's conclusion to be instructive and reach the same conclusion here.

[19] Further, review of the record reveals that Mincey, *i.e.*, the party seeking to introduce the evidence relating to J.T.'s prior prostitution conviction, did not file a motion as required by the procedures set for in Evidence Rule 412(c) for determining whether such evidence should be admitted at trial. Mincey did not inform the trial court, the State, or J.T. prior to trial that it intended to introduce such evidence or describe the evidence or state the purpose for such evidence. In light of Mincey's failure to provide timely written notice as required by Evidence Rule 412(c), any evidence related to J.T.'s prior sexual conduct was properly excluded. *See Conrad*, 938 N.E.2d at 856 (providing that

in light of the requirements of Evidence Rule 412(c), "Conrad's failure to provide timely written notice required exclusion of any evidence related to any" prior sexual conduct of the victim); *Sallee v. State*, 785 N.E.2d 645, 651 (Ind. Ct. App. 2003) (providing that the defendant's failure to comply with the requirements of Evidence Rule 412 "precluded her from presenting evidence of the victim's past sexual history" and that the failure "also results in waiver of this issue on appeal"), *trans. denied*. As such, we conclude that the trial court did not abuse its discretion in excluding evidence relating to J.T.'s prior sexual conduct.

## II. Prosecutorial Misconduct

[20] Mincey also contends that the deputy prosecutor committed prosecutorial misconduct during his closing argument.

> In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006), quoted in *Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012). A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. *Mahla v. State*, 496 N.E.2d 568, 572 (Ind. 1986). "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the *probable persuasive effect of the misconduct on the jury's decision* rather than the degree of impropriety of the conduct." *Cooper*, 854 N.E.2d at 835 (emphasis added) (citations omitted). To preserve a claim of prosecutorial misconduct, the

defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial. *Id.*; *see also Maldonado v. State*, 265 Ind. 492, 498, 355 N.E.2d 843, 848 (1976).

*Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014).

[21] During closing argument, the deputy prosecutor made the following argument:

> Let's talk about what you saw there yesterday, her demeanor on the stand. She was testifying about the worse [sic] day in her life, the day in which her anus was lacerated when she had to go to the hospital and have a rape kit done. She described the sexual assault. Then defense began asking questions. And I want you to think back about how those questions were asked. Think about the demeanor of not just J.T. but how those questions were asked to her. Were those questions asked in the same way that questions were asked to other witnesses? Was the doctor asked questions in the same manner? Or the DNA experts? Were the officers? No. That was reserved for J.T. And it wasn't necessarily polite. It doesn't have to be, but it makes sense that she would be upset about it. Not only that, but she was called a prostitute while she was sitting on the stand. After describing a violent anal rape, she got called a prostitute. Think back to her head whipping over and looking when that question was asked. Who wouldn't be upset by that?

Tr. Vol. III, pp. 122-23. At the same time as the deputy prosecutor was making this argument, he displayed a PowerPoint slide to the jury which stated the following:

> Demeanor
> • Demeanor on the Stand

· She had just finished testifying about the worst day in her life
> · She graphically described a violent sexual assault
>
> · Then, the Defense began asking questions - How were those questions asked?
>
> · In addition to that, he accused her of being a prostitute
· She's Angry -
>> · SO WHAT?
>>
>> · Can You Tell Me How a Rape Victim *Should* Act?

Tr. Vol. IV, p. 67 (emphasis in original).

[22] At this point, defense counsel requested permission to approach and the following exchange occurred outside of the hearing of the jury:

> [Defense Counsel]: This is inappropriate argument by the State. They know she has a conviction for prostitution. That was brought to their attention, and he's arguing -- he is in fact taking that and arguing that. That is inappropriate. That is prosecutorial misconduct.
> [The State]: At no point did I say she wasn't convicted. I didn't even comment on that. All I said was she accused of it right after she got done testifying about a rape. I think that's relevant.
> [The Court]: Now, wait a minute though. You did object to him bringing up -- and I kept that out. And now when he can't respond to that, you're bringing it up that he accused her of being a prostitute when you know for a fact that – there's nothing he can do in response to that. And you know she has a conviction for that.
> [The State]: From ten years ago.

[The Court]: But still --

[The State]: And I've just talked about this night.

[Defense Counsel]: He has it up on his PowerPoint. In addition to that, he accused her of being a prostitute.

[The Court]: So what do we do now?

[Defense Counsel]: I mean I'm moving for a mistrial.

[The State]: Is the peril so grave that there's no way that he can receive a fair trial?

[The Court]: Okay. So how do we correct that problem?

[The State]: The same way we did when he was asking her the question on the stand.

[The Court]: What's that?

[The State]: Instruct the jury that they can use their memory of the questions --

[The Court]: But the issue is -- the issue is that you objected to him getting into the prostitution even after she denies she had a conviction for being a prostitute. And I said you're right; I'm going to keep that evidence out. Then you turn around and the impression that you create is that she was not being a prostitute and she did not have a conviction for being a prostitute --

[The State]: Correct --

[The Court]: Hear me out. At a point where he can't say anything to rebut that.

[The State]: I would be happy to clarify and say that she was being accused of being a prostitute that day and she was upset about that.

[Defense Counsel]: Well, here's the problem --

[The State]: I think that clarification is enough.

[Defense Counsel]: The problem is that one of these jurors actually asked a question asking her about that. We were unable to give that evidence to the jury because of the State's objection.

[The State]: And I am not even talking -- we're talking about two separate lines of questions here. I am talking about when he said --

[The Court]: Here's what we're going to do. You're going to move on from this subject. I'm going to instruct the jury that

that argument that you just made in regard to being accused of
being a prostitute was inappropriate for you to make --

[The State]:        Okay.  That's fair.

[The Court]:        -- given the rulings in this case.  And you're
to move on.

[The State]:        Okay.

Tr. Vol. III, pp. 123-25.  The trial court then gave the following admonishment
to the jury:

> Okay.  The last argument that was made -- or you see in the
> PowerPoint, in addition to that he's accused her of being a
> prostitute, was an improper argument for the State to have made.
> And I'm going to ask you to ignore that part of his closing
> argument.  It's not evidence of anything.  It was inappropriate.
> We dealt with this issue before.  It was inappropriate for him to
> bring it up and argue it.  So ignore it.  It's not a reflection on him
> or on the State, but just ignore that portion of the argument.

Tr. Vol. III, p. 126.  Mincey did not object to this admonishment.

[23]    Mincey claims that the deputy prosecutor "[u]ndeniably" committed
prosecutorial misconduct in his closing argument because he (1) "implied that
J.T. had no history or convictions for prostitution, when in fact the prosecutor
was aware of such a conviction" and (2) "resisted every attempt by the defense
to bring out" information indicating that J.T. had lied during her deposition
about ever being convicted of prostitution.  Appellant's Br. p. 20.  Mincey
further claims that the deputy prosecutor's closing argument "clearly implied
that J.T. had no history of prostitution and was being unjustly accused of acts of

prostitution and that it was understandable why she would be upset being accused of being a prostitute." Appellant's Br. p. 20.

[24] Our review of the State's comments and PowerPoint presentation convince us that contrary to Mincey's claims, the deputy prosecutor was referring to the contemporaneous allegations made by Mincey that J.T. was involved in prostitution on the night in question and in no way implied that J.T. had no history or convictions for prostitution. Mincey acknowledges that throughout the trial, "the defense had consistently advanced a theory of an act of prostitution that went bad." Appellant's Br. p. 20. As is mentioned above, the trial court had allowed Mincey to question J.T. at length about whether she was engaged in prostitution on the night in question. The fact that J.T. had engaged in prostitution on at least one occasion in 2004 does not prove that she was engaged in prostitution in 2014. Mincey did not present any evidence indicating that J.T. was engaged in prostitution in 2014, and J.T. flatly denied each allegation raised by Mincey that she was engaged in prostitution on the night in question. It is not unreasonable that a witness would be upset about being alleged to currently be a prostitute, even if one had committed prostitution on at least one occasion at least ten years prior. Further, given Indiana's Rape Shield Rule, the State was correct to resist every attempt by the defense to "bring out" information relating to prior sexual acts of an alleged rape victim. As such, we conclude that the deputy prosecutor's comments did not amount to prosecutorial misconduct.

Furthermore, even if the deputy prosecutor's comments could be deemed to amount to prosecutorial misconduct, Mincey has failed to establish that such comments placed him in a position of grave peril to which he would not have been otherwise subjected. First, as the State notes, the deputy prosecutor's comments did not add anything to the evidence, as Mincey repeatedly insinuated that J.T. was engaged in prostitution on the night in question. Second, the trial court admonished the jury that the deputy prosecutor's comments were merely argument, not evidence, and should be ignored. We assume that "'the jury are [persons] of sense, and that they will obey the admonition of the court.'" *Thomas v. State*, 9 N.E.3d 737, 743-44 (Ind. Ct. App. 2014) (quoting *Moore v. State*, 669 N.E.2d 733, 741 (Ind. 1996)) (brackets added). Absent an argument that the admonishment was ineffective, which Mincey does not make on appeal, we conclude that the trial court's curative instruction defused the impact of the State's allegedly improper comments. *Id.* at 744 (citing *Bernard v. State*, 540 N.E.2d 23, 25 (Ind. 1989); *Parsons v. State*, 472 N.E.2d 915 (Ind. 1985)).

[26] The judgment of the trial court is affirmed.


May, J., and Barnes, J., concur.